The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

Olga Mae PRATT, Defendant–Appellant.

No. 86SA401.

Supreme Court of Colorado, En Banc.

July 5, 1988.

Rehearing Denied Aug. 8, 1988.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., John Milton Hutchins, First Asst. Atty. Gen., Clement P. Engle, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Lee Jay Belstock, Denver, William H. Kirkman, Jr., Colorado Springs, for defendant-appellant.

MULLARKEY, Justice.

■ The defendant was convicted of accessory to crime and conspiracy to commit accessory to crime, pursuant to sections

18-8-105 and 18-2-201, 8 C.R.S. (1978), and was sentenced to four years of probation with a condition that she not take part in nursing home affairs for a period of one year.[1] Because we hold that the prosecution impermissibly cross-examined defense witnesses concerning collateral matters, we reverse the defendant's conviction and remand the case for a new trial.

## I.

The defendant, Olga Pratt, is the primary owner and the director of nursing of Norton's Nursing Home in Colorado Springs. The charges in this case arose out of an incident on December 30, 1984, in which an orderly employed by Norton's, Kenneth Berzinis, assaulted a patient of Norton's, John Howard. Howard was ninety-seven years old at the time of the assault and did not testify at trial; his daughter and his physician, however, did testify. Testimony at trial focused on when the defendant learned of the assault and whether she obstructed the police investigation of the incident.

On December 30, 1984, Berzinis was the orderly in charge of two rooms, one of which was occupied by John Howard. Howard was described by all parties as a difficult patient, often causing disturbances and fabricating stories about staff abuse. Howard was unable to walk on his own and needed assistance in leaving his bed. Berzinis testified at trial that, on the day of the assault, Howard had become "increasingly demanding, cantankerous, and unable to be satisfied," and that Howard's behavior made him tense. Berzinis further testified that he was adjusting the mattress and pillows on Howard's bed with Howard in the bed and that, while doing so, "a fist was seen off my peripheral vision. At that moment, the man was injured." In response to questioning by the prosecutor, Berzinis explained that he had hit Howard.

Berzinis eventually confessed to the police and pled guilty to third degree assault.

The events subsequent to the assault were a source of controversy at trial. Mary Wilburn was a registered nurse at Norton's and was a codefendant at trial. She was the supervising nurse on duty on the day of the assault. Wilburn testified that she heard moaning coming from Howard's room, and that she entered the room and found Howard in the bathroom sitting on the toilet. She noted that his left eye was badly swollen and asked him what had happened. He stated, "fist in my eye." She then transferred Howard to his bed, examined him, and placed an icebag on his eye.

Berzinis testified that, following the assault, he moved Howard from the bed to a portable toilet, and that he never moved Howard to the bathroom. This was corroborated by Janet Hern, a former nurse of Norton's. She testified that when she entered Howard's room shortly after the assault and asked Berzinis what had happened, he replied "I lost it; I hit him." Hern was fired by Norton's on February 18, 1985. The defense introduced into evidence Hern's employment file, which documented various incidents of deficient work performance by Hern dating back to April of 1984.

Both Berzinis and Hern testified that, although they were in Howard's room following the incident, they never observed an icebag on Howard's eye. Berzinis testified that he was in Howard's room when Wilburn entered, and that Howard was sitting on the portable toilet at that time. Jerry Cain, a janitor on duty at Norton's on the day of the assault, testified that he had entered Howard's room while Berzinis was there, that he then discovered Howard's injury, and that he informed Wilburn of the injury. Cain also testified that Howard was in bed at this time, although earlier he had stated to police detectives that Howard

---

**1.** The trial court actually sentenced the defendant to two years of imprisonment on each count and suspended those sentences subject to the conditions that the defendant remain on probation for four years, pay the costs of the action, and not take part in nursing home affairs for one year. We note that the trial court was without authority to impose imprisonment, suspend the sentence, and then impose probation. *People v. Flenniken,* 749 P.2d 395, 398 (Colo. 1988); *see People v. District Court,* 673 P.2d 991, 996 (Colo.1983).

was sitting on the portable toilet. The defendant and several other witnesses challenged Hern's and Berzinis' account of the incident by testifying that the nursing home did not have a portable toilet like they described.

Wilburn immediately telephoned the defendant after discovering Howard's injury. She testified that she informed the defendant that Howard had been injured and that, although Berzinis was the orderly in charge of Howard's room, she did not think he was responsible for Howard's injury. The defendant asked to speak to Berzinis and told him that patient abuse would not be tolerated, that he was to go home for the day, and that he was to meet with her on the next morning to discuss the incident. Berzinis testified that he did not, during this telephone conversation, tell the defendant that he had hit Howard, although he claimed that he had told Wilburn that he had injured Howard. When confronted by defense counsel with his deposition testimony, Berzinis testified that he had stated to Wilburn: "Mary, I'm not going to lie to you; the man has been hit, but I'm not sure how he got hit." Wilburn testified that Berzinis did not make this statement or any other statement indicating that he had assaulted Howard.

Following this telephone conversation, the defendant went to the nursing home. She testified that she was unable to locate anyone who had seen or heard anything concerning the assault. She also testified that, although Hern at first told her that she knew what happened, Hern also told her that she had not seen or heard anything. Hern testified that she told the defendant that Berzinis and Howard had told her that Berzinis had assaulted Howard, but that the defendant told her to "keep my mouth shut until I found out what was going on." The defendant denied making this statement.

A meeting was held on December 31 among the defendant, Berzinis, and other members of Norton's staff. Testimony concerning this meeting also was conflicting. Berzinis testified that the defendant opened the meeting by stating that the Howard incident could have very serious repercussions, including criminal charges against Berzinis, a lawsuit against Norton's, higher insurance rates, and bad publicity for the nursing home. Berzinis testified that he stated at this meeting that, although he wasn't totally clear as to what had happened, he believed that he had hit Howard, although the incident was "accidental." He also testified that, although he did not in any way imply that Howard accidentally fell in the bathroom, the defendant stated at the meeting that any public statements would be to the effect that Howard was accidentally injured in the bathroom.

The defendant testified that, while the possibility of criminal charges against Berzinis was mentioned at the meeting, potential repercussions to the nursing home were never brought up. She further testified that, although Berzinis did state "I must have hit him, I might have," after being informed that Howard's jaw was broken in two places, Berzinis also stated that he couldn't have possibly done that. The defendant testified that no effort was made to convince Berzinis to do anything but tell the truth concerning the incident. The defendant's version of the December 31 meeting was corroborated at trial by the testimony of the other staff members at the meeting. The defendant further testified that she was concerned about falsely accusing Berzinis of the assault and that she did not believe she had enough information to accuse Berzinis.

The defendant called her insurance agent after this meeting, and informed him that a patient was found injured in the bathroom. She also told the insurance agent that Berzinis was on duty at the time, but that she did not know whether he was involved, and requested that an investigator be sent to the nursing home. Testimony of the insurance agent confirmed the defendant's testimony.

On January 7, two police investigators met with the defendant, a staff member, and the nursing home attorney. The police investigators testified that the defendant told them that Wilburn had found Howard

injured in the bathroom, that there was some doubt about what had happened and whether Berzinis was responsible, and that Berzinis was suspended until the conclusion of the insurance investigation at which time she would decide whether he would be retained or fired. The defendant and her attorney testified that they had informed the police investigators about the December 31 meeting and Berzinis' statements at that meeting, that there were several rumors regarding the incident but no actual witnesses, and that Hern had told her that she knew what had happened. The police investigators denied during their testimony that they had received this additional information.

On January 7, 1985, Berzinis confessed to police that he had assaulted Howard. He pleaded guilty to third degree assault on July 11, 1985.

■ The defendant was charged on January 15, 1985, with accessory to third degree assault. This charge subsequently was amended to add a charge of conspiracy to commit accessory to third degree assault. The defendant was convicted by a jury of both charges, and was sentenced to probation for four years on the condition that she not take part in nursing home affairs for a period of one year. The defendant now appeals her conviction.[2]

## II.

The defendant claims that the trial court erred in allowing the prosecution, during cross-examination of defense witnesses, to inquire several times into two incidents of alleged misconduct. We agree with this contention and reverse the defendant's conviction.

■ At trial, the defense called Eddie Bishop, the business manager of Norton's nursing home. During its cross-examination, the prosecution asked for a recess, and an *in camera* hearing was held at which the prosecution made an offer of proof concerning allegedly fraudulent activity by the nursing home administrators,

and indicated its intention to cross-examine Bishop regarding this matter. The prosecutor stated that the nursing home had been investigated by the state Department of Social Services concerning its bookkeeping for various Medicaid accounts. He further stated that Bishop had accepted full responsibility for any improper accounting although the prosecutor conceded that no charges were ever filed. The defense produced a letter from the Department of Social Services addressed to Bishop acknowledging receipt of funds from the nursing home to cover all cash shortages, stating that the audit had been closed, and thanking Bishop for his cooperation. The defendant objected to this line of questioning, arguing that a government audit by itself was not indicative of truthfulness. The trial court ruled that CRE 608 permitted this inquiry.

CRE 608(b) provides that specific instances of the conduct of a witness may, "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified." While we recognize that the decision whether to allow this type of cross-examination is within the discretion of the trial court, *People v. Crawford*, 191 Colo. 504, 507, 553 P.2d 827, 829 (1976); *see People v. Raffaelli*, 647 P.2d 230, 234 (Colo. 1982), the conduct inquired into nevertheless must be probative of the truthfulness or untruthfulness of the witness. *See People v. Saldana*, 670 P.2d 14, 15 (Colo.App. 1983) (approving trial court's ruling preventing cross-examination of the prosecution's investigator as to his past use of marijuana because such evidence is not probative of truthfulness or untruthfulness).

During his cross-examination of Bishop, the prosecutor questioned Bishop about monies that were improperly withheld from Medicaid patients. Bishop explained the

2. Because the defendant challenges the constitutionality of the accessory statute, we have juris-

diction to decide this case pursuant to section 13–4–102(1)(b), 6A C.R.S. (1987).

circumstances surrounding the audit and denied that any wrongdoing had occurred. There was no evidence, other than an audit by the state Social Services Department, of any fraudulent activity by Bishop. To be admissible under CRE 608, questions of this sort must relate to the truthfulness of the witness. The offer of proof made by the prosecutor at the *in camera* hearing indicated bookkeeping errors at most, and not fraudulent action. Nevertheless, the prosecutor's insinuation of fraudulent conduct was made clear to the jury, despite the defense's efforts at explaining the situation.

Unproven accusations, by themselves, do not raise an inference of improper actions. For example, an arrest alone is not admissible to impeach a witness' credibility. *E.g., United States v. Labarbera,* 581 F.2d 107, 108 (5th Cir.1978); *United States v. Ling,* 581 F.2d 1118, 1121 (4th Cir.1978); *United States v. Hodnett,* 537 F.2d 828, 829 (5th Cir.1976). This is because arrests "happen[ ] to the innocent as well as the guilty." *Ling,* 581 F.2d at 1121 (quoting *Michelson v. United States,* 335 U.S. 469, 482, 69 S.Ct. 213, 222, 93 L.Ed. 168 (1948)). Total and complete exclusion of an arrest is generally required because "the probative value of such evidence is so overwhelmingly outweighed by its inevitable tendency to inflame or prejudice the jury against the defendant." *Ling,* 581 F.2d at 1121; *see Labarbera,* 581 F.2d at 109. Similarly, a pending criminal charge against a witness is an improper subject for impeachment. *United States v. Farid,* 733 F.2d 1318, 1320 (8th Cir.1984). By analogy, these considerations apply to the Social Services audit of the defendant's business and Bishop's role in that audit. We cannot say that an audit which results in a settlement concluding with a letter of thanks from the investigating agency is probative of the untruthfulness of the person audited.

The Eighth Circuit Court of Appeals reached a similar issue in *United States v. Dennis,* 625 F.2d 782 (8th Cir.1980). The court upheld the trial court's rejection of the defendant's attempt to cross-examine a witness about an arrest for tax problems, which arrest did not result in a conviction. 625 F.2d at 798. The court held that civil tax problems cannot be regarded as indicating a lack of truthfulness under Fed.R. Evid. 608(b), which is identical to CRE 608(b). 625 F.2d at 798; *accord Shafer v. American Employers' Ins. Co.,* 535 F.Supp. 1067 (W.D.Ark.1982) (quoting *Dennis* and holding that a possible discrepancy between a witness' testimony and his tax returns was not probative of his truthfulness or untruthfulness and thus not admissible under Fed.R.Evid. 608(b)). We believe that the instant situation is comparable to that in *Dennis,* and we hold that the trial court abused its discretion in allowing this cross-examination of Bishop.

The prosecution compounded its wrongful action with its cross-examination of two other witnesses called as character witnesses for the defendant. The prosecutor asked both witnesses whether they were aware that Norton's Nursing Home had wrongfully retained approximately $15,000 from patients and Medicaid and whether they were aware that the defendant had ordered that a patient be tied to an upright chair every evening.

■ We note first that, in general, inquiry into the prior acts of a criminal defendant is not allowed. A defendant on trial for a specific offense should not be expected or required to meet anything other than the specific accusation made against her. *E.g., Edmisten v. People,* 176 Colo. 262, 275, 490 P.2d 58, 64 (1971); *Stull v. People,* 140 Colo. 278, 283, 344 P.2d 455, 458 (1959). An accused has the right to know the allegations against which she must defend. *Edmisten,* 176 Colo. at 275, 490 P.2d at 64; *Stull,* 140 Colo. at 283, 344 P.2d at 458. These basic tenets are particularly applicable where the prosecution has not demonstrated that the questioning concerned incidents indicative of wrongdoing.

■ The defendant properly introduced testimony concerning her good reputation pursuant to CRE 404(a)(1) and CRE 405(a).[3]

---

3. CRE 404(a) provides in pertinent part: "Evidence of a person's character or a trait of his

The prosecution's cross-examination of the defendant's character witnesses is controlled by CRE 405(a), which allows inquiry into "relevant specific instances of conduct."

We address first the prosecution's cross-examination of the character witnesses regarding whether they were aware that Norton's Nursing Home had wrongfully retained approximately $15,000 from patients and Medicaid. When a defendant puts her character in issue by offering testimony as to her good reputation or opinion testimony concerning her character, the prosecution's cross-examination is limited to relevant specific instances of conduct. Relevant specific instances of conduct are instances related to the character trait put in issue. *E.g., United States v. Curtis*, 644 F.2d 263, 268, 269 (3d Cir.1981); *United States v. Wooden*, 420 F.2d 251, 252–53 (D.C.Cir.1969) (quoting *Michelson*, 335 U.S. at 483–84, 69 S.Ct. 222); *State v. Hinton*, 206 Kan. 500, 479 P.2d 910, 915 (1971). *See generally* K. Broun, G. Dix, E. Gellhorn, D. Kaye, R. Meisenholder, E. Roberts, J. Strong, *McCormick on Evidence* § 191, at 568–69 (3d ed. 1984) (hereinafter *McCormick*); 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 608[06], at 608–55 (1987) (hereinafter *Weinstein*). "[R]elevant specific instances of conduct are only instances going to the accuracy of the character witnesses' testimony." *Curtis*, 644 F.2d at 268 (citation and emphasis omitted).

█ The first character witness called, Virginia Harlan, testified that the defendant had a "fine reputation," and that Norton's Nursing Home was "excellent," "very professional," and had "impeccable business practices [with] no theft." The second character witness, Arlene Linton, the executive director of the Colorado Health Care Association, testified that the defendant "has a great amount of respect from all of the individuals who deal routinely with nursing homes in Colorado," and that she had "no reason to ever question" the defendant's truth and veracity.

As to character witness Linton, any evidence of wrongdoing on Bishop's part was unrelated to the testimony offered by Linton, which was limited to the defendant's personal reputation for truth and veracity and the respect afforded her by others in the nursing home profession. *See, e.g., United States v. Fox*, 473 F.2d 131, 135 (D.C.Cir.1972) (prejudicial error was committed when the trial court allowed the prosecution to ask a defense character witness questions concerning the defendant's arrest for rape because "[t]here is no obvious relationship between rape and veracity"); *Wooden*, 420 F.2d at 253 (holding that convictions for drunkenness are not relevant to a reputation for honesty and integrity and for peace and good order and reversing the defendant's conviction). The trial court therefore erred in allowing this questioning.

Concerning character witness Harlan, had Bishop engaged in fraudulent business practices, this conduct would be relevant to the witness' assessment of Norton's "impeccable business practices." We do not believe, however, that the evidence offered by the prosecution, which did not establish fraudulent activity, was related to the "accuracy of the character witness' testimony." *Curtis*, 644 F.2d at 268. When asked about this conduct on cross, Linton testified that such an audit was "not unusual ... in the nursing-home industry."

█ While we recognize that some courts have allowed cross-examination of character witnesses concerning rumors which may or may not be grounded in fact, *see, e.g., Shimon v. United States*, 352 F.2d 449, 453 (D.C.Cir.1965); *Hohman v. State*, 669 P.2d 1316, 1327 n. 10 (Alaska

character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except ... [e]vidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same...."

CRE 405(a) provides: "In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct."

App.1983), we believe the better-reasoned approach is to require a showing from the impeaching party that the acts forming the basis for the rumor actually occurred, *e.g., Curtis,* 644 F.2d at 268 n. 2 ("The matters the witness is to be asked about should first be established to the trial judge's satisfaction as actual events.") (quoting *United States v. Lewis,* 482 F.2d 632, 639 (D.C. Cir.1973)); *Hinton,* 479 P.2d at 917 (trial court should establish, out of the presence of the jury, that "there is no question as to the fact of the subject matter of the rumor, that is, of the previous arrest, conviction or other pertinent misconduct of the defendant"); *Miller v. State,* 418 P.2d 220, 225 (Okl.Crim.App.1966) (same). *See generally* 2 *Weinstein, supra* ¶ 405[02], at 405–33 (1986) ("if the court discovers that the question put on cross is unfair—either because it is unfounded or can be explained away—it should not permit the question" (footnote omitted)). The prosecution asked both character witnesses if they were aware that Norton's Nursing Home had "kept about $15,000 in money that should have gone to either patients or Medicaid." We hold that, because there was no basis in fact for these questions, the questions were improper.

■ We next consider the prosecution's examination concerning an alleged order by the defendant that a patient be tied in an upright chair every evening. We also conclude that this line of inquiry was improper. The defendant denied any knowledge of this incident during her testimony. Character witness Linton explained that doctors often order such a procedure, called "poseying," for the patient's protection.

Questions directed toward impeaching a witness must be asked in good faith. *See People v. Robles,* 183 Colo. 4, 6, 514 P.2d 630, 631 (1973) (questioning by district attorney regarding a prior felony conviction which the district attorney knew did not exist is reversible error); *People v. Thompson,* 182 Colo. 198, 200, 511 P.2d 909, 910 (1973) (questions about prior felonies must be asked by the prosecuting attorney in good faith); *People v. Lewis,* 180 Colo. 423,

426–27, 506 P.2d 125, 126 (1973) (same). This general principle likewise is applicable when cross-examining character witnesses. When questioning character witnesses, counsel should not "tak[e] a random shot at a reputation imprudently exposed or [ask] a groundless question to waft an unwarranted innuendo into the jury box." *Michelson v. United States,* 335 U.S. 469, 481, 69 S.Ct. 213, 221, 93 L.Ed. 168 (1948) (footnote omitted). A good faith basis is required to question character witnesses concerning specific incidents seemingly at odds with the witnesses' assessment of the defendant's character. *United States v. Canniff,* 521 F.2d 565, 573 (2d Cir.1975) ("adequate basis" required), *cert. denied,* 423 U.S. 1059, 96 S.Ct. 796, 46 L.Ed.2d 650 (1976); *United States v. Beno,* 324 F.2d 582, 588 (2d Cir.1963) ("good faith belief" required); *United States v. Curtis,* 494 F.Supp. 279, 283 (E.D.Pa.1980) (quoting *Michelson*), *rev'd on other grounds,* 644 F.2d 263 (3rd Cir.1981); *People v. Eli,* 66 Cal.2d 63, 56 Cal.Rptr. 916, 424 P.2d 356, 367 (quoting *Michelson* and holding that trial courts must "scrupulously prevent cross-examination based upon mere fantasy"), *cert. denied,* 389 U.S. 888, 88 S.Ct. 136, 19 L.Ed.2d 188 (1967).

The prosecutor established no good faith basis for this line of cross-examination; in fact, the only evidence presented on the issue was the defendant's denial of such an incident. Once the prosecutor asked the question, the jury was clearly informed that the state believed that such an incident had occurred and was improper, without any showing by the prosecution of its basis for the question or the relevance of the incident.

■ CRE 103(c) provides: "In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury." When the prosecution wishes to submit similar transaction evidence pursuant to CRE 404(b), we have imposed an obligation on the prosecutor to obtain a favorable

ruling from the trial court prior to attempting to admit the evidence. *Stull,* 140 Colo. at 284, 344 P.2d at 458; *see People v. Scheidt,* 182 Colo. 374, 381, 513 P.2d 446, 450 (1973); *Kurtz v. People,* 177 Colo. 306, 313, 494 P.2d 97, 101 (1972). We explained the rationale for this rule in *Stull:*

> Bearing in mind that evidence of similar acts has inhering in it damning innuendo likely to beget prejudice in the minds of jurors, and that such evidence tends to inject collateral issues into a criminal case which are not unlikely to confuse and lead astray the jury, it becomes exigent that courts observe the fine balance in regard to such evidence that must exist between the necessity of proof on the part of the prosecutor and the danger of unfair prejudice to the defendant.

140 Colo. at 284, 344 P.2d at 458 (citations omitted).

We believe the same reasoning applies to cross-examination of character witnesses concerning other acts of the defendant. Other courts have held that a trial court should rule on the propriety of such cross-examination prior to any attempt at questioning. *Curtis,* 644 F.2d at 268 n. 2, *Lewis,* 482 F.2d at 639; *Hinton,* 479 P.2d at 913, 917; *Miller,* 418 P.2d at 225. *See generally McCormick, supra,* § 191, at 569–70 ("As a precondition to cross-examination about other wrongs, the prosecutor should reveal, outside the hearing of the jury, what his basis is for believing in the rumors or incidents he proposes to ask about. The court should then determine whether there is a substantial basis for the cross-examination." (footnotes omitted)); 2 *Weinstein, supra,* ¶ 405[02], at 405–33 ("If the attorney has the slightest doubt about the propriety of the question he should raise it at sidebar to prevent introducing unnecessary prejudice into the case. This is particularly important because the proponent of the witness is not generally permitted to bring in extrinsic proof to show that

the question is unwarranted and the jury is likely to assume that the court would not have permitted it to be asked unless its predicate were true." (footnote omitted)).

The prosecutor in this case made no effort to obtain a ruling from the trial court prior to asking questions concerning a highly prejudicial incident, which may not have even occurred. This line of questioning clearly was prejudicial and may have led the jury to discredit the testimony of the character witnesses. In addition, as with the audit questions, there is no indication, even if the incident actually occurred, that it was improper. We therefore doubt whether the questioning was relevant. Thus, we hold that the prosecution failed to establish a good faith basis that the incident actually occurred, and also failed to demonstrate the relevance of the questions. Therefore, the prosecutor's cross-examination of both character witnesses as to the alleged poseying incident was improper.[4]

▮▮▮▮ The People argue that, even if the cross-examination of Bishop and the defendant's character witnesses was improper, it was harmless error because "it dealt with matters which were truly fleeting and inconsequential when considered in context of the meat and potatoes of the trial." We cannot agree that the errors in this case were harmless. The People concede that the lengthy trial transcript contains a multitude of versions of the incidents which gave rise to the conviction. The trial was a complicated one, and a substantial amount of the testimony presented was contradictory. Many of the witnesses were impeached with their prior statements. The trial turned on which witnesses the jury chose to believe. The prosecution directly attacked the credibility of the defendant and another important defense witness, Bishop, with improper questioning. Defense counsel consistently objected to the prosecution's cross-examination.[5] The prosecutor stressed throughout

---

**4.** Evidence of specific acts of an individual to prove her character may also be admissible pursuant to CRE 404(b), but no argument has been presented that this section is applicable.

**5.** Defense counsel objected several times during the *in camera* hearing to the cross-examination of Bishop on the grounds that it was not admissible under CRE 608, that the subject of the cross-examination was not indicative of truth-

his closing argument that the case turned on the credibility of the witnesses and which witnesses the jury chose to believe.[6] We cannot say that the errors which occurred did not affect the substantial rights of the defendant. Crim.P. 52(a). *See Wooden,* 420 F.2d at 253 (where the decisive issue before the jury is one of credibility, improper cross-examination of the defendant's character witness was not harmless error because "evidence of [the defendant's] good reputation might well have tipped the scales in his favor; for evidence of good reputation standing alone may create a reasonable doubt"); *Shimon,* 352 F.2d at 453 (character evidence alone may raise a reasonable doubt of guilt) (citing *Edgington v. United States,* 164 U.S. 361, 17 S.Ct. 72, 41 L.Ed. 467 (1896)). We therefore reverse the defendant's conviction.

We also will address the following issues which are likely to recur at the new trial.

### III.

The accessory statute under which the defendant was convicted provides that "[a] person is an accessory to crime if, with intent to hinder, delay, or prevent the discovery, detection, apprehension, prosecution, conviction, or punishment of another for the commission of a crime, he renders assistance to such person." § 18–8–105(1), 8 C.R.S. (1978). "Render assistance" is defined as including "[b]y force, intimidation, or deception, obstruct[ing] anyone in the performance of any act which might aid in the discovery, detection, apprehension, prosecution, conviction, or punishment of such person." § 18–8–105(2)(d), 8 C.R.S. (1978). The defendant argues that the definition of the term "render assistance" makes the statute unconstitutionally vague and overbroad.

A penal statute offends due process if it forbids or requires the doing of an act in terms so vague that persons of common intelligence necessarily must guess as to its meaning and differ as to its application. *E.g., Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); *People v. Rowerdink,* 756 P.2d 986, 990–991 (Colo.1988); *People v. Moore,* 674 P.2d 354, 356–57 (Colo.1984). The vagueness doctrine also demands that a statute provide clearly defined standards to minimize arbitrary and discriminatory enforcement of the laws and to inform a court and a jury whether a crime has been committed and proved. *E.g., People v. Jennings,* 641 P.2d 276, 278 (Colo.1982); *People v. Thatcher,* 638 P.2d 760, 765 (Colo. 1981). There is a limit, however, to the degree of precision that can be reasonably

---

fulness, and that the prosecution had not established a good faith basis for the questions. Following one of these objections, the trial judge stated that defense counsel had "already objected" and "that's all that's required under the rules." Additional formal objections in the presence of the jury are not required. *See Uptain v. Huntington Lab, Inc.,* 723 P.2d 1322, 1330–31 (Colo.1986) (objections during motion *in limine* satisfy the purposes of the contemporaneous objection rule).

Defense counsel also objected to the prosecution's first question concerning the alleged poseying incident. Although defense counsel did not specifically object to the questioning of the character witnesses concerning the alleged misappropriation of funds, or to the questioning of the second character witness regarding poseying, we believe that the defendant preserved these issues for appeal with her previous objections. *E.g., United States v. Talavera,* 668 F.2d 625, 630 (1st Cir.), *cert. denied,* 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982); *United States v. Brown,* 555 F.2d 407, 422 n. 32 (5th Cir.1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978); *Padilla v. Southern Pac.*

*Transp. Co.,* 131 Ariz. 533, 642 P.2d 878, 880 (1982). *See generally McCormick, supra,* § 52, at 118 (Requiring repetitious objections places the objector "in the invidious semblance of a contentious objector, and conduces to waste of time and fraying of patience. Most courts, however, hold that [the objector] is entitled to assume that the judge will continue to make the same ruling and that he need not repeat the objection." (footnotes omitted)); C. Wright & K. Graham, *Federal Practice and Procedure* § 5037, at 191 (1977) ("[U]nder the better traditional view, an objection overruled will suffice to preserve the point as to all subsequently offered evidence of the same type; the objector need not continue to object each time such evidence is offered." (footnote omitted)).

**6.** For instance, the prosecution stated early in his closing argument: "The evidence that you've looked at comes down to who are you going to believe. That's flat the one issue that you're going to be deciding back there in the jury room. . . . And that's what this whole case comes down to."

expected of a legislative enactment. *Rowerdink*, at 991; *People v. Garcia*, 197 Colo. 550, 553, 595 P.2d 228, 230 (1979).

The People argue that *People v. Young*, 192 Colo. 65, 555 P.2d 1160 (1976), which rejected a vagueness challenge to the accessory statute then in effect, controls our decision in this case. *Young* relied on *Self v. People*, 167 Colo. 292, 448 P.2d 619 (1968), which also rejected a vagueness challenge to the applicable accessory statute. *Self* interpreted a statute significantly different from the one presently at issue, and, for that reason, is not controlling.[7] The statute at issue in *Young*, § 40–8–105, 12 C.R.S. (1971 Perm.Supp.), was identical in all pertinent respects to section 18–8–105(1) and (2); the particular language which the defendant challenges, however, was not at issue in *Young* and, thus, *Young* also is not controlling.

The defendant relies upon our decision in *People v. Hoehl*, 193 Colo. 557, 568 P.2d 484 (1977). In *Hoehl* we interpreted the child abuse statute, section 18–6–401(1)(a), 8 C.R.S. (1973), which provided in pertinent part: "A person commits child abuse if he knowingly, intentionally, or negligently, and without justifiable excuse, causes or permits a child to be: ... [p]laced in a situation that may endanger the child's life or health...." Relying on a definition of "may" as "be in some degree likely," we held that "[s]o construed, we seriously doubt whether 'may' in a criminal statute provides a fair description of the prohibited conduct, since virtually any conduct directed toward a child has the possibility, however slim, of endangering the child's life or health." *Hoehl*, 193 Colo. at 560, 568 P.2d at 486 (citations omitted). The defendant argues that use of the word "might" in the accessory statute raises identical problems.

We agree with the defendant's argument. "Might" is defined as "express[ing] permission, liberty, probability, possibility in the past ... or less probability or possibility than may...." *Webster's Third New International Dictionary* 1432 (1986). Thus, "might" is even more speculative than "may," and the connection between the defendant's actions and the prohibited result is more tenuous than that which we condemned in *Hoehl*.

The People attempt to distinguish *Hoehl* by arguing that the accessory statute contains other elements, *i.e.*, an "intent to hinder, delay, or prevent" and the use of "force, intimidation, or deception," which are certain enough to cure any ambiguity created by the use of "might." We reject this argument; the inclusion of several definite elements in a criminal statute cannot solve the constitutional deficiency created by the failure of the legislature to define a critical element of the statute with sufficient certainty.

We also held in *Hoehl*, however, that, where necessary, we would construe "may" as importing a greater degree of certainty than that normally attached to the word, and we construed the word "may" to mean a reasonable probability that the forbidden result would obtain. *Hoehl*, 193 Colo. at 560, 568 P.2d at 486. We hold that such a construction of "might" likewise is appropriate for purposes of the criminal accessory statute.

The defendant further argues that the accessory statute is unconstitutionally broad. An overbreadth challenge usually is applicable to legislative enactments which threaten the exercise of fundamental or express constitutional rights. *Rowerdink*, at 990; *Garcia*, 197 Colo. at 552, 595 P.2d at 230 (1979). A statute also may be overbroad if, in addition to proscribing conduct which can be prohibited under the state's police power, it purports to prohibit conduct that is not within the police power. *Rowerdink*, at 990; *People v. Sequin*, 199 Colo. 381, 384, 609 P.2d 622, 624 (1980).

The defendant does not allege that the statute at issue impinges upon a fundamental right or other constitutionally protected

---

**7.** The statutory language at issue in *Self* was as follows: "An accessory after the fact is a person who, after a full knowledge that a crime has been committed, conceals it from the magistrate, or harbors and protects the person charged with or found guilty of the crime." Section 40–1–13, 3 C.R.S. (1963).

interest; in fact, the defendant has provided no example of legitimate conduct which is threatened by this statute. In any event, we hold that any overbreadth problem inherent in the accessory statute is cured by our limiting construction of the statute.

The defendant did not request, and the trial court did not give, a special instruction in accordance with our views in this opinion. Because we are reversing the defendant's conviction on other grounds, we need not determine whether the failure to give such an instruction constituted plain error. *See People v. Rubanowitz*, 688 P.2d 231 (Colo.1984).

### IV.

The defendant argues that the information charging her was insufficient. We reject this argument.

■■■■■ An information is sufficient if it advises the defendant of the charge she is facing so that she can adequately defend herself and be protected from further prosecution for the same offense. *E.g., People v. Moore*, 200 Colo. 481, 484, 615 P.2d 726, 728 (1980); *People v. Albo*, 195 Colo. 102, 106, 575 P.2d 427, 429 (1978). The amended information tracked the language of the accessory statute, specified a sixteen day period during which the offense allegedly occurred, and named Berzinis as the principal involved.[8]

The defendant relies upon the vague wording of the statute in support of her argument. We rejected a similar argument in *Hoehl*, where the information also tracked the statutory language, despite our holding that the statutory language required a limiting instruction. 193 Colo. at 561, 568 P.2d at 487. As in *Hoehl*, the defendant has failed to demonstrate any prejudice from the allegedly vague infor-

mation; she argues only that the information prevented her from preparing a defense. The record demonstrates that the defendant was quite aware of the nature of the prosecution's charges against her, that the trial was, in fact, hotly contested, and that the defendant failed to demonstrate any prejudice caused by the information. Thus, we hold that the information was sufficient.

### V.

We reverse the defendant's conviction and remand the case to the trial court for a new trial.

ROVIRA, J., joins in the opinion except for Part II.

VOLLACK, J., concurs in part and dissents in part.

ERICKSON, J., joins in the concurrence and dissent.

**VOLLACK, Justice, concurring in part and dissenting in part.**

I agree with Part IV of the majority opinion, which upholds the sufficiency of the information. I also concur in the result reached by the majority on the constitutionality of the accessory statute in Part III, but I would use a different analysis to reach that result. I dissent to Part II because I do not believe that the trial court abused its discretion in permitting the prosecution's cross-examination of three witnesses for the defense.

### I.

The majority holds that the trial court abused its discretion in allowing certain cross-examination of Bishop, at 682, and that the prosecution "compounded its wrongful action with its cross-examination

---

8. The accessory to crime charge of the information read as follows: "Between December 30, 1984 and January 14, 1985, [the defendant] with intent to hinder, delay and prevent the discovery, detection, prosecution, conviction, punishment and apprehension of KENNETH WARREN BERZINIS for the commission of Second Degree Assault on Elderly, as defined by C.R.S. 18–3–203 and 18–3–209, as amended, did knowingly, feloniously and unlawfully render assist-

ance to the said KENNETH WARREN BERZINIS, by obstructing law enforcement authorities and others, by force, threat and intimidation, in the performance of acts which might aid in the discovery, detection, apprehension, prosecution, conviction or punishment of the said principal defendant; in violation of Colorado Revised Statutes 18–8–105(1) and (2), as amended, Accessory to Crime."

of two other [character] witnesses," at 682, requiring reversal of the convictions. At 684. I disagree with these conclusions.[1]

## A.

### Cross–Examination of Bishop

The trial court permitted the prosecution to cross-examine witness Bishop about an audit conducted by a state agency that revealed possible misappropriation of $15,000 in funds. Bishop was the nursing home's business manager and assistant administrator, and was also ten percent owner of the business; he testified that he was solely responsible for the financial affairs of the nursing home. The trial court specifically ruled that this cross-examination, which it held to be relevant to Bishop's credibility, would be permitted under CRE 608. That Rule states:

> *Specific instances of the conduct of a witness,* for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in 13–90–101, may not be proved by extrinsic evidence. They *may,* however, *in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, ...*

CRE 608(b), 7B C.R.S. (1984) (emphasis added). CRE 611 also provides:

> **(b) Scope of cross-examination.** *Cross-examination should be limited to* the subject matter of the direct examination and *matters affecting the credibility of the witness.* The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

7B C.R.S. (1984) (emphasis added).

" 'The rule is that for the purpose of impeaching the credibility of a witness he may be questioned as to misconduct, even as to collateral matters, which has a tend-

ency to show his lack of honesty or truthfulness; the qualification of the rule being that the party questioning him is bound by his answers and may not contradict him with regard thereto.' " *Simon v. United States,* 123 F.2d 80, 85 (4th Cir.), *cert. denied,* 314 U.S. 694, 62 S.Ct. 412, 86 L.Ed. 555 (1941) (quoting *Pullman Co. v. Hall,* 55 F.2d 139, 141 (4th Cir.1932)). The questioning party is not permitted to introduce extrinsic evidence in order to contradict the witness. CRE 608(b) ("Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, ... may not be proved by extrinsic evidence.").

Rule 608(b) therefore "authorizes inquiry into specific instances of misconduct on cross-examination but requires that they must be 'clearly probative of truthfulness or untruthfulness.' " 3 J. Weinstein ¶ 608[05], at 608–43 (1987) (footnotes omitted) (hereinafter Weinstein). Misconduct is not limited to criminal convictions. Some courts permit "inquiry into non-conviction misconduct" and generally limit that inquiry "to conduct relevant to veracity or relevant to veracity and honesty." Weinstein ¶ 608[05], at 608–42 (footnotes omitted). "The rule is that for the purpose of impeaching the credibility of a witness he may be questioned as to misconduct, even as to collateral matters, which has a tendency to show his lack of honesty or truthfulness." *Pullman Co. v. Hall,* 55 F.2d 139, 141 (4th Cir.1932).

The decision as to the scope and limits of cross-examination, even in a criminal case, is within the sound discretion of the trial court. *Denbow v. Williams,* 672 P.2d 1011, 1014 (Colo.1983). Absent a showing of an abuse of discretion, the trial court's rulings will not be disturbed on review. *People v. Crawford,* 191 Colo. 504, 507, 553 P.2d 827, 829 (1976). The question before the trial judge was whether the cross-examination of Bishop about the audit was a

---

**1.** The majority does not make clear whether reversible error was committed by the cross-examination of Bishop alone, by the cross-examination of character witnesses Harlan and Linton alone, or by cumulative error. I would hold that no reversible error occurred with respect to the cross-examination of witness Bishop, that no error occurred with respect to cross-examination of character witnesses Harlan and Linton, and that no cumulative error occurred.

matter "affecting the credibility of the witness" and whether this questioning involved specific instances of Bishop's conduct, going to his "character for truthfulness or untruthfulness." CRE 608(b); 611(b). The question on appeal is whether the trial court abused its discretion in permitting this cross-examination.

A number of jurisdictions have ruled that such questioning is permissible. In *United States v. Holt*, 817 F.2d 1264 (7th Cir.1987), the prosecution was permitted to cross-examine a defense witness—the defendant's wife—regarding an incident of her prior misconduct. The cross-examination, which focused on whether she had used checks that she later reported as stolen, was held to be "probative of [her] credibility as a witness," therefore admissible under FRE 608(b). 817 F.2d at 1273.

This situation often arises when a defendant takes the witness stand. An "accused in a criminal proceeding who takes the stand is subject to the same kind of cross-examination as any other witness," and can therefore be cross-examined about non-conviction misconduct. *Hug v. United States*, 329 F.2d 475, 484 (6th Cir.), *cert. denied*, 379 U.S. 818, 85 S.Ct. 37, 13 L.Ed. 2d 30 (1964); *Simon*, 123 F.2d at 85 ("It is well settled ... that where a defendant elects to make himself a witness he may be cross-examined as such."). *See United States v. Sullivan*, 803 F.2d 87, 90–91 (3d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 889, 93 L.Ed.2d 841 (1987) (Because the defendant's credibility was an issue in the case, it was not error for the trial court to permit cross-examination of Sullivan regarding his fraudulent replies on his income tax forms and financial disclosure forms.); *United States v. Sperling*, 726 F.2d 69 (2d Cir.), *cert. denied*, 467 U.S. 1243, 104 S.Ct. 3516, 82 L.Ed.2d 824 (1984) ("It was ... proper for the government to cross-examine Sperling regarding his false credit card applications to show a general lack of credibility. This is acceptable cross-examination under Fed.R.Evid. 608(b)(1)." *Id.* at 75.); *Kitchen v. United States*, 221 F.2d 832 (D.C.Cir.1955), *cert. denied*, 357 U.S. 928, 78 S.Ct. 1378, 2 L.Ed.2d 1374 (1958) ("Questions upon collateral issues for impeachment purposes on cross-examination are permissible if the subject matter of the question bears directly upon the veracity of the witness in respect to the issue involved in the trial." 221 F.2d at 834 (footnote omitted)); *see also Pullman Co. v. Hall*, 55 F.2d 139, 141 (4th Cir.1932).

The first question is whether the trial court abused its discretion in permitting this cross-examination. Based on the rulings in other jurisdictions, I would conclude that the trial court here did not abuse its discretion. While another judge may have arrived at a different conclusion, the judge here heard all of the evidence, observed the demeanor of the witnesses, and made his decision in that context. His conclusion that this cross-examination was relevant, and that its probative value outweighed the possible prejudice, was within his discretion.

Even if the trial court abused its discretion, that determination is unnecessary unless the defendant has made a showing that reversible error occurred. To be reversible, the error must substantially influence the verdict or affect the fairness of the trial proceedings. *People v. Quintana*, 665 P.2d 605, 612 (Colo.1983). *See United States v. Clemente*, 640 F.2d 1069 (2d Cir.), *cert. denied*, 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981) (Questioning of the defendant about his filing of false loan applications is permitted under FRE 608, but the admission of fraudulent loan applications into evidence was erroneous because specific instances of conduct cannot be proved by extrinsic evidence. However, the error in admitting extrinsic evidence was held to be harmless. *Id.* at 1083.).

Bishop's testimony was that he was solely responsible for the bookkeeping errors discovered in the audit, and that Pratt was not responsible for financial matters. He was rehabilitated on redirect examination with the letter from Department of Social Services. This issue related to Bishop, not Pratt. At trial, Bishop took complete responsibility for all aspects of Norton's finances.

This misappropriation and the resulting audit in May and June of 1983 was presented as a specific instance of Bishop's conduct, which is permissible in this context, but extrinsic evidence was not presented, thus complying with CRE 608. The questioning party is bound by the answers and may not present evidence in contradiction; that limitation was followed here.[2] On re-direct examination, defense counsel was given an opportunity to rehabilitate Bishop. Part of that rehabilitation consisted of Bishop reading into the record the letter he received from the Department of Social Services Audit Settlement Office indicating resolution of the audit and thanking Bishop for his cooperation.[3]

Based on the record, it is clear that the defendant has not established that this cross-examination substantially influenced the verdict or affected the fairness of her trial. For these reasons, I would conclude that no reversible error occurred in the cross-examination of Bishop.[4]

2. The following exchange took place during the cross-examination of Bishop:

Q [district attorney] I'm going to direct your attention back to 1983, specifically to May and June of 1983—and the months after that and before, but specifically in June of 1983. Is it not true that the monies on my first example—the monies that should have been paid back to the application for Medicaid were not paid back to Medicaid. In fact, Norton's—Or did not pay it back to the families. Norton's kept the money from the families and Norton's kept the money from Medicaid.

A Let's make a clarification here.

Q I'm asking a yes or no question.

A No.

Q That was not done?

A No.

Q Okay. Is it not true during that time period—

[defense counsel]: Your Honor, I think he's asked the question now, and it's been answered.

[district attorney]: I'm going through the three examples.

THE COURT: Objection is overruled.

Q [district attorney] In May and June of 1983, money that should have been—If a patient was deceased or moved out, that money that should have been paid back to Medicaid was not paid back to Medicaid for the remainder of the month. Norton's kept that money.

A I would say no.

Q Is it not true that the money that should have been offset against social security was kept by Norton's again?

A No.

Q You said you had an explanation.

A All right. I have a letter.

Q I don't want to know about a letter.

[defense counsel]: I think that he's asked the question; he's answered it. We went over it in chambers.

THE COURT: Objection is overruled. The question is whether or not it's extrinsic evidence. He's allowed to cross examine him. You may proceed.

Q [district attorney] I'm not interested in any letters received in December of '83. I'm interested in your explanation of why you say no, that that did not occur.

A Because in view of the facts that—The rules are that if they apply for Medicaid and they're approved, that first they must apply all of their income toward their care. And they receive $29 personal funds. And all of the monies and everything was substantiated and accounted for. And that proportion that was due the State or due the patient was refunded. It might have been after the fact, but it was refunded. And we certainly have not kept it in Norton's.

3. The following testimony was heard by the jury:

Q [defense counsel] And these—Did the state of Colorado send you a letter?

A [Bishop] Yes, sir.

Q And how was it finally resolved according to the letter?

A It says, "Dear Mr. Bishop: This is to acknowledge the closure of the above-referenced Audit on December 6, 1983, and receipt of your due to the state amount of $4,991.61. Your personal needs cash shortage of $15,684.71 has been resolved with your payment to all adjustments as confirmed by my on-site inspection of December 6.

"Remember that any returned personal needs disbursements may be forward[ed] and monies turned over to this money for disbursement regarding in-the-home patients.

"The proper posting of all prospective ledger cards will assure that your next audit begins with a clear slate. I thank you for your cooperation in settling the audit, and I trust that your next audit will be much easier to resolve following the new accounting practices.

"Sincerely, Mike Bryan, Audit Settlement Office, Investigations and Audits."

That was dated December the 9th, 1983. So considering that that was a ten-year audit, that's less than one half of one percent deficiency, so I can't see where anybody felt that anybody had anything to gain from it.

4. *United States v. Dennis*, 625 F.2d 782 (8th Cir.1980), and *Shafer v. American Employers' Insurance Co.*, 535 F.Supp. 1067 (W.D.Ark.1982), the cases relied upon by the majority, do not

## B.

### Cross–Examination of Character Witnesses

When a character witness testifies as to a defendant's good character or reputation in the community, the state can cross-examine the witness as to the witness' familiarity with and knowledge of the defendant who has put his character into issue. Cross-examination should be limited to "those specific acts of the accused demonstrably probative of veracity." Weinstein ¶ 608[06], at 608–54. Such an inquiry is permitted "not because it is relevant to defendant's character ... but because it is *relevant to the credibility of the [character] witness,* as a means of testing his familiarity with the defendant and his qualifications to express an opinion about the accused or attest to his reputation." Weinstein ¶ 608[06], at 608–54 (emphasis added) (footnote omitted); *see Shimon v. United States,* 352 F.2d 449, 453–54 (D.C.Cir.1965); *see also People v. Couch,* 179 Colo. 324, 329, 500 P.2d 967, 969 (1972) (impeachment must be directed to a witness' credibility, not character). "Once the defendant has opened the door to a discussion of his character by calling character witnesses.... on cross-examination, the prosecution may ask defendant's character witnesses *whether they have heard about or know about specific acts* committed by defendant in order to test this knowledge and standards for good reputation." 2 J. Weinstein ¶ 405[02], at 405–22 to –23 (footnotes omitted); *see Brindisi v. People,* 76 Colo. 244, 253, 230 P. 797, 801 (1924) ("When a witness has testified to reputation, no cross-examination can be effective which precludes an inquiry into what the witness has heard and upon which his conclusions must be based."). CRE 405 provides:

> **(a) Reputation or opinion.** In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

7B C.R.S. (1984).[5]

This cross-examination is, of course, subject to the general limitations of CRE 403, which requires the exclusion of evidence if its probative value is substantially outweighed by the chance of resulting confusion or prejudice. Weinstein ¶ 405[02], at 405–31. There are other limitations: the prosecutor must ask impeachment questions in good faith, but the determination of whether good faith exists is discretionary with the trial judge. *People v. Thompson,* 182 Colo. 198, 200, 511 P.2d 909, 910 (1973); *People v. Lewis,* 180 Colo. 423, 426–27, 506 P.2d 125, 126 (1973); *State v. Sample,* 673 S.W.2d 61, 67 (Mo.App.1984) ("[C]ross-examination of character witnesses ought to be done in good faith, and the crimes inquired about ought not to be apocryphal, existing along [sic] in the fertile fancy of a public prosecutor."). Also, the proper form for such questioning must be used. *Romero v. People,* 181 Colo. 305, 309, 509 P.2d 301, 303 (1973). In *People v. Futamata,* 140 Colo. 233, 343 P.2d 1058

---

stand for the proposition that questioning a witness about his civil tax problems under Rule 608(b) creates a reversible error. In *Dennis* the Eighth Circuit Court of Appeals held that a trial court properly excluded evidence of a tax-related arrest that did not result in a conviction, but was silent on the issue of whether admission would create a reversible error. 625 F.2d at 798. In *Shafer,* the trial court refused to order the plaintiff in a personal injury case to produce evidence of income tax returns. The plaintiff had never been convicted, arrested, or even investigated in this regard. The court not only was silent on the issue of whether admission of such evidence would create a reversible error, it stated that the evidence could be inquired into if the plaintiff made loss of income an issue at trial. 535 F.Supp. at 1069.

**5.** CRE 405 is substantially identical to the Federal Rule, except for the language in subsection (b): "except as limited by 16–10–301."

> One commentator has stated:
> The same tests for determining when a particular person is qualified to speak of the witness' reputation should be applied under Rule 608 as when reputation is being used to prove character pursuant to Rule 405, except that the Rule 608 testimony must relate to the witness' reputation at the time of trial—rather than at the time he committed the acts charged—and must be relevant to truthfulness—rather than to any other character trait.

3 J. Weinstein ¶ 608[03], at 608–21 to –22 (footnotes omitted).

(1959), this court described the standards and proper form for this type of cross-examination.

> [T]he trial court should conduct a preliminary inquiry out of the presence of the jury so as to insure (a) that the alleged misconduct is actual; (b) that it is reasonably likely that it was the subject of the rumor in the community; (c) that it is not too remote and that it was of the same character as the act on trial. The trial judge should also ... see to it that the question is properly formed, that is, "Have you heard?" and that the jury is instructed at the time as to the limited purpose of the inquiry.

*Id.* at 236–37, 343 P.2d at 1060 (citing *State v. Steensen,* 35 N.J.Super. 103, 113 A.2d 203 (1955)).

The prosecution may, in good faith, ask whether a defense character witness,—who testified that he had known the defendant for fifteen years and that the defendant had a good reputation for truth and veracity—has heard rumors that the defendant bought or received stolen property. *Sample,* 673 S.W.2d at 67 (applying plain error standard). Knowledge of such rumors was held to be relevant because that knowledge would be inconsistent with the witness' assertion of the defendant's good reputation.

*Arizona v. Lehman,* 126 Ariz. 388, 616 P.2d 63 (1980) (The prosecutor cross-examined the character witness "about specific instances of [the defendant's] violent conduct or violent behavior." The Arizona Supreme Court upheld this cross-examination because "a character witness may be asked on cross-examination about specific instances of conduct, provided they are relevant." *Id.* at 391, 616 P.2d at 66.)

The prosecution can cross-examine character witnesses "about whether they had considered allegations of misconduct" by the accused that relate to his character for truth and veracity. *Hohman v. State,* 669 P.2d 1316, 1327 (Alaska App.1983). As the Alaska court noted, the state "does not have to prove that the allegations are true, since the purpose of the inquiry is to ascertain whether the witness considered the allegations in forming his or her opinion about [the accused's] truth and veracity." *Id.* at 1327 n. 10.

The cross-examination at issue here fully complied with the limits and requirements of such questioning. The defendant called these character witnesses and brought her own character into issue.[6] The questions were presented in the proper form.[7] The prosecution did not attempt to impermissibly enter extrinsic evidence to challenge

---

6. Character witness Linton testified as to Pratt's reputation:

> Q [defense counsel] Now, in your dealings with all the state agencies in the state of Colorado, have you discussed with members of those agencies the reputation of Mrs. Pratt and Norton Nursing Home?
> A [Linton] Yes, I have.
> Q And will you tell us what that reputation is in the state of Colorado?
> A In the state of Colorado, through the state agencies, the legislative body, Olga holds—has a great amount of respect from all of the individuals who deal routinely with nursing homes in Colorado.
> Q And from your knowledge of Mrs. Pratt, what is your opinion of her truth and veracity?
> A I have no reason to ever question it.

Character witness Harlan testified:

> Q [defense counsel] And have you talked with people who know Mrs. Pratt as well as yourself? In other words, have you talked to other people about Mrs. Pratt?
> A [Harlan] I have known Mrs. Pratt's fine reputation for many, many years.

> Q All right. And will you tell the Court and the jury what that reputation is?
> A Excellent. Excellent nursing home, very professional. And it was my experience to have an elderly aunt in the nursing home for 11 months, so I experienced it firsthand.
>
> ....
>
> Q All right. Do you know the reputation of Mrs. Pratt for truth and veracity?
> A To my best knowledge, there's just no question about it, I feel. Complete integrity.

7. Harlan was questioned on cross-examination in the following manner:

> Q [district attorney] You were talking about the way Norton's was run and the way Mrs. Pratt handled things. Were you aware that in 1976, Mrs. Pratt had a patient by the name of Carolyn Gray who liked to go out at night to bars and drink, so that Mrs. Pratt ordered that she be tied in an upright chair every evening? Were you aware of that?
> [defense counsel]: Your Honor, I'm going to object to this.
> THE COURT: Objection is overruled.
> THE WITNESS: I did not know about this. My aunt had to be tied to a chair at times.

the character witness' answers. This cross-examination by the prosecution "does not appear ... to have been unnecessarily emphasized or drawn out." *Hohman,* 669 P.2d at 1328. Because I believe the record shows that the cross-examination at issue was correctly permitted and conducted, I do not find an abuse of discretion.[8] For

> Q [district attorney] All night long?
>
> A Not to my knowledge, no. But when she became difficult to handle, that was the only way was restraint.
>
> Q Does that give you a different opinion about her reputation?
>
> A None.
>
> Q Were you aware that in 1983, Norton's Nursing Home in May and June of that year kept approximately $15,000 from patients that they shouldn't have kept?
>
> A I know nothing about that.
>
> Q Involving about 35 patients? Would that change your opinion of Norton Nursing Home's reputation?
>
> A I don't know how true it is.
>
> Q If it was true?
>
> A I don't think it would. I don't think that—
>
> [district attorney]: I have no further questions of this witness.

Cross-examination of Linton was as follows:

> Q [district attorney] You talked about Mrs. Pratt's reputation. Were you aware that in 1976, there was a patient staying at Norton's by the name of Carolyn Gray and that Carolyn Gray was someone who liked to go out and drink at night so that upon Mrs. Pratt's orders, Carolyn Gray was tied to a sit-up type chair for the entire night on a consistent basis?
>
> A [Linton] I would assume that she was probably posied. But no, I'm not aware of that situation.
>
> Q Is that something you would do with a patient?
>
> A Based on doctor's orders. Many times you do have to restrain patients for their own protection. And that's usually a decision that is made by a patient-care planning committee with input from the physician. And it is not tying them to a chair; it's poseying them to a chair and releasing them on a routine basis.
>
> Q But not the—not for an entire night, nights on end.
>
> A I don't know that that situation happened.
>
> Q Does that change your opinion—
>
> A Does not change my opinion.
>
> Q —of Olga Pratt's reputation?
>
> A No, because I don't know that that's true.
>
> Q Were you aware that in 1983, it was discovered that in May and June of 1983, Norton's Nursing Home kept about $15,000 in money that should have gone to either patients or Medicaid?

this reason, I would hold that no error occurred during the cross-examination of the character witnesses.[9]

## II.

Turning to the issue of the constitutionality of section 18–8–105, 8B C.R.S. (1986),

> A I have been made aware that there was an audit performed and that there was a $15,-000 restitution—reimbursement made. That is, I might add, not unusual to happen in the nursing-home industry.
>
> Q And they were required to pay back approximately 35 patients.
>
> A I don't know. I don't know that. I don't know how many patients there were.
>
> Q $15,000 to 35 patients is significant money to them because they don't earn much, is that correct?
>
> A I understand it was a ten-year audit.
>
> . . . .
>
> Q Does that change your opinion of her reputation?
>
> A Absolutely not.
>
> Q Or the home's reputation?
>
> A Absolutely not.

**8.** This conclusion is further supported by the objection found in the record. During the cross-examination of Harlan, defense counsel objected to questioning about the poseying incident, but did not object to questioning about the audit. *See supra* note 6. Defense counsel did not object when Linton was questioned about the audit or about the poseying incident, nor did he object when Harlan was questioned about the audit. It thus appears that if there was any error, it would be subject to the plain error standard, except for the questioning of Harlan about the poseying incident. *See* Crim.P. 52(b), 7B C.R.S. (1984).

**9.** "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Crim.P. 52(a), 7B C.R.S. (1984). Impeachment of the character witnesses was for the purpose of assessing the completeness of the witness' information about Pratt, not whether the allegations were true.

To assess reversible error, the inquiry is whether the error substantially influenced the verdict or affected the fairness of the trial proceedings, not whether there was sufficient evidence to support the verdict. *People v. Quintana,* 665 P.2d 605, 612 (Colo.1983). In this case, I believe the majority should have determined whether the testimony at issue had a substantial effect or influence on the verdict before reversing the defendant's convictions. *People v. Hanson,* 189 Colo. 101, 102, 537 P.2d 739, 741 (1975). I would conclude that the cross-examination of the character witnesses neither substantially influenced the verdict, nor affected the fairness of the trial proceedings.

the accessory statute, I agree with the majority that its disposition is not controlled by our holdings in *People v. Young*, 192 Colo. 65, 555 P.2d 1160 (1976), and *Self v. People*, 167 Colo. 292, 448 P.2d 619 (1968).[10] The accessory statute has been altered significantly since *Self* was decided, and the language examined in *Young* is not at issue in this case. I disagree with the majority that "might" can be construed as "a reasonable probability." Nevertheless, I believe that the statute can be given a constitutional interpretation, and therefore concur in the result reached by the majority.

In addition to those principles correctly recited by the majority, a statute enjoys a presumption of constitutionality, and the party challenging it has the burden of proving its unconstitutionality beyond a reasonable doubt. *Orsinger Outdoor Advertising, Inc. v. Department of Highways*, 752 P.2d 55, 61 (Colo.1988); *People v. McBurney*, 750 P.2d 916, 920 (Colo.1988). If a statute is capable of alternative constructions, one of which is constitutional, then the constitutional interpretation must be adopted. *People v. Randall*, 711 P.2d 689, 692 (Colo.1985).

Section 18–8–105 provides in pertinent part:

(1) A person is an accessory to crime if, with intent to hinder, delay, or prevent the discovery, detection, apprehension, prosecution, conviction, or punishment of another for the commission of a crime, he *renders assistance* to such person.

(2) "Renders assistance" means to:

. . . .

(d) By force, intimidation, or deception, obstruct anyone in the performance of any act which *might* aid in the discovery, detection, apprehension, prosecution, conviction, or punishment of such person. . . .

8B C.R.S. (1986) (emphasis added).[11]

Sections (1) and (2)(d) contemplate the interaction of at least three persons: a principal perpetrator, an accessory, and a third person. An accessory renders assistance to the principal perpetrator under section (2)(d) when, by force, intimidation, or

---

**10.** Because the majority decides this case on grounds of improper questioning of witnesses on cross-examination, it has no need to discuss the constitutionality of the accessory statute. *See, e.g., Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969); *Hutchinson v. People*, 742 P.2d 875, 887 (Colo.1987) (Vollack, J., dissenting); *People v. Bossert*, 722 P.2d 998, 1004 (Colo.1986); *People v. Lybarger*, 700 P.2d 910, 915 (Colo.1985); *Ricci v. Davis*, 627 P.2d 1111, 1121 (Colo.1981); *Board of County Comm'rs v. City & County of Denver*, 194 Colo. 252, 256, 571 P.2d 1094, 1096 (1977); *Friedman v. Motor Vehicle Div.*, 194 Colo. 228, 229, 571 P.2d 1086, 1087 (1977); *Tyler v. School Dist. No. 1*, 177 Colo. 188, 189–90, 493 P.2d 22, 23 (1972). Consequently its interpretation of section 18–8–105(2)(d) must be viewed as mere dictum.

By contrast, I must reach this issue because I conclude that the prosecution's cross-examination of three defense witnesses created no reversible error.

**11.** The definition of "render assistance" in section 18–8–105(2)(d) represents a modification of the Model Penal Code definition of "hindering apprehension or prosecution." This modification, which represents a statutory expansion of common law accessory liability, originated in New York. New York Penal Law section 205.50 (McKinney 1975) provides:

[A] person "renders criminal assistance" when, with intent to prevent, hinder or delay the discovery or apprehension of . . . a person who he knows or believes has committed a crime, . . . he:

4. Prevents or obstructs, by means of force, intimidation or deception, anyone from performing an act which *might* aid in the discovery or apprehension of such person or in the lodging of a criminal charge against him. . . .

(Emphasis added). The practice commentaries to section 205.50 provide that "divulging information to a prosecutor" is an example of conduct that subsection four was designed to criminalize.

Several states in addition to Colorado have adopted the New York modification of the Model Penal Code by including the word "might" in their formulation of what constitutes "rendering assistance." *See* Model Penal Code § 242.3, comment 4 at 235–36 & n. 53 (1980); Ark.Stat. Ann. § 5–54–105(a)(3) (1987); Conn.Gen.Stat. § 53a–165 (1987); Del.Code Ann. tit. 11, § 1244 (1987); Ky.Rev.Stat.Ann. 520.110 (Michie 1985); Me.Rev.Stat.Ann. tit. 17–A, § 753.1.E (1983); Mont.Code Ann. § 45–7–303(2)(d) (1987); N.H. Rev.Stat.Ann. § 642.3(I)(d) (1986); N.J.Rev.Stat. § 2C: 29–3(a)(5) (1982); Or.Rev.Stat. § 162.325(1)(d) (1987). Whether the word "might" renders these statutes unconstitutional, however, has never been decided.

deception, she obstructs a third person in performing any act which has *some tendency* to aid in the discovery, detection, apprehension, prosecution, conviction, or punishment of the principal perpetrator.

It is sheer speculation to guess what effect information that was never transmitted would have had on the listener. An accessory cannot escape criminal culpability because the information that a third party attempted to provide to the authorities or other third parties would not, to a reasonable probability, have aided in the discovery, detection, apprehension, prosecution, conviction, or punishment of the principal perpetrator. This interpretation of section (2)(d) recognizes that fact. More importantly, this interpretation recognizes the legislative determination that information which has *some* tendency to aid in the discovery, detection, apprehension, prosecution, conviction, or punishment of the principal perpetrator is so valuable that proof beyond a reasonable doubt of its obstruction by force, intimidation, or deception, made with the requisite specific intent, subjects the defendant to criminal culpability as an accessory to crime and obstructor of justice. *See, e.g.,* W. LaFave & A. Scott, *Criminal Law* § 6.9, at 597, 599–600 (2d ed. 1986); 4 C. Torcia, *Wharton's Criminal Law* §§ 35, 594 (14th ed. 1981). Thus, a defendant can be guilty of rendering assistance to a principal perpetrator under section 18–8–105(2)(d) by obstructing the transmission of information to the police, regulatory authorities, prosecutors, or other third persons, *even if these persons would have disregarded or refused to respond to the information,* with the result that the information would not have aided in the discovery, detection, apprehension, prosecution, conviction, or punishment of the principal perpetrator.

This interpretation avoids the problem created by the child abuse statute in *People v. Hoehl,* 193 Colo. 557, 568 P.2d 484 (1977). Under that statute, a defendant would have been guilty of child abuse if,

with the requisite specific intent, he "causes or permits a child to be: (a) [p]laced in a situation that *may* endanger the child's life or health...." § 18–6–401(1)(a), 8 C.R.S. (1973) (emphasis added). The child abuse statute imposed criminal culpability upon the defendant not as an accessory but as the perpetrator of the crime. We recognized that, when the word "may" was given its normal meaning as to "be in some degree likely," the child abuse statute would probably not provide a fair description of the prohibited conduct, "since virtually any conduct directed toward a child has the possibility, however slim, of endangering the child's life or health." *Hoehl,* 193 Colo. at 560, 568 P.2d at 486 (citations omitted). In this case, however, the prohibited conduct is the act of obstructing *another* from transmitting any information which might aid in the discovery, detection, apprehension, prosecution, conviction, or punishment of the principal perpetrator. The prosecution in both cases still bears the burden of proving beyond a reasonable doubt that the defendant committed a particular act with a specific intent.

In my view, a defendant "renders assistance" to a principal perpetrator and becomes an accessory to crime when she (1) commits the act of obstructing a third person from providing information about the principal perpetrator by force, intimidation, or deception (2) with the specific intent to hinder, delay, or prevent the discovery, detection, apprehension, prosecution, conviction, or punishment of the principal perpetrator. Although the statute does not place an affirmative duty on persons to apprise third parties such as the police of information which might aid in the capture of criminals, it does treat someone who obstructs another from apprising them of this information as an accessory to crime. As such, I believe that section 18–8–105(2)(d) gives a fair description of the conduct prohibited by the statute, and is not unconstitutionally vague.[12]

---

**12.** The majority states that, under the dictum of *Rubanowitz,* a special jury instruction would be required to explain the full meaning that the word "might" has acquired through case law. At 685 (citing *People v. Rubanowitz,* 688 P.2d 231, 239 (Colo.1984) ("may" means "reasonably

For these reasons, I would affirm the trial court.

I am authorized to say that Justice ERICKSON joins in this concurrence and dissent, and Justice ROVIRA joins in Part I of this concurrence and dissent.

probable")). Because I do not interpret the word "might" in the fashion construed by the majority, I would not require a special jury instruction to be given.