Lawrence E. KITCHEN, Appellant,

v.

UNITED STATES of America, Appellee.

No. 12229.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 22, 1954.

Decided Jan. 13, 1955.

Petition for Rehearing In Banc Denied Feb. 3, 1955.

Bazelon, Circuit Judge, dissented.

Mr. Robert Martin, Washington, D. C. (appointed by this Court), for appellant.

Mr. Lewis Carroll, Asst. U. S. Atty., with whom Mr. Leo A. Rover, U. S. Atty., and Mr. Thomas A. Flannery, Asst. U. S. Atty., were on the brief, for appellee.

Before WILBUR K. MILLER, PRETTYMAN and BAZELON, Circuit Judges.

PRETTYMAN, Circuit Judge.

■ Appellant Kitchen was indicted for perpetrating a robbery and for killing one Hysan in the course of perpetrating it. He was convicted of murder in the second degree.[1] This appeal followed.

The principal point urged here concerns a question sought to be put to a Government witness by counsel for the defense. This witness, one Tyree, was the night clerk of the hotel where the alleged murder occurred and where Kitchen lived. Tyree testified he saw Kitchen in a restaurant (not in the hotel) with Hysan about five o'clock on the afternoon preceding the crime, and Kitchen spoke to him about his rent, which he said he would pay the next day. A number of other people also saw Hysan and Kitchen drinking together for a long period of time in the restaurant. About two-thirty the next morning a guest in the hotel came to Tyree, and as a result of their conversation the two went together and listened outside the door to Kitchen's room. Tyree heard a loud snoring noise; nothing further was done about it. Tyree went off duty at seven o'clock in the morning. Just after he had gone to bed a young man came to his door and gave Mrs. Tyree a key which he said he had found and which bore a tag showing it to be the key to Kitchen's room. At about one o'clock in the afternoon of that same day, a maid having reported to him, Tyree went with her to Kitchen's room and there found a man lying face down on the floor with a pillow under his head. Tyree expressed the view that the man was drunk. He was left undisturbed, and a report was made to the hotel manager. About three-thirty the same afternoon Tyree went again to Kitchen's room, this time with another lodger, and tried to rouse the man, who was still on the floor. Failing to rouse him, Tyree notified the police. The officers decided the man was sick and called an ambulance. A doctor turned the man over, and as he did so the man stopped breathing, dying at that moment. Tyree recognized Hysan. Tyree was cross-examined at length (some fifty pages in the transcript). After redirect he was recross-

1. The facts warranted the court's instruction on second degree murder. Goodall v. United States, D.C.Cir., 1950, 86 U.S. App.D.C. 148, 180 F.2d 397, 17 A.L.R. 2d 1070, certiorari denied 1950, 339 U.S. 987, 70 S.Ct. 1009, 94 L.Ed. 1389.

This was the second trial of the cause. Conviction of first degree murder upon the first trial was reversed by this court. Kitchen v. United States, 1953, 92 U.S. App.D.C. 382, 205 F.2d 720.

834

examined (four pages in the transcript). Counsel for the defense then said, "That is all I have," and the prosecutor said, "That is all." The witness stepped down.

At the close of the Government's case, two days later, counsel for the defense told the court that the police, pursuant to a subpoena, had produced a record showing that Tyree had been charged at one time with making a false report of a robbery[2] and had forfeited $25.00 collateral on the charge. Counsel said he would like to confront Tyree with the charge for the purpose of impeaching him. The trial judge postponed decision on the matter, and later there was extensive argument on the point. The question, as stated by counsel, was "whether Tyree could be impeached by showing that a charge had been placed against him and that he forfeited—there was no trial". The trial court at first ruled that he would permit the single question, whether the witness Tyree had elected to forfeit on a certain charge on a certain day, but he asked for authorities on the point. The next day the point was further argued, and the court finally held that such a question on a collateral issue for impeachment purposes could be allowed only when a conviction of the witness had occurred. The ruling was based in part upon the local statute[3] and in part upon the view that "otherwise we are going to be tied up with collateral issues that don't go to the merit of the case itself."

 The trial court was clearly correct in its ruling upon the question as presented. An election to forfeit collateral for violation of a police regulation is not a conviction for crime.[4] But upon argument here our attention was directed to another view of the problem.

We requested and received additional memoranda from the parties. Questions upon collateral issues for impeachment purposes on cross-examination are permissible if the subject matter of the question bears directly upon the veracity of the witness in respect to the issue involved in the trial.[5] In the case at bar it is urged that Tyree may have had reason to promote a finding of guilt against Kitchen because Tyree himself might have been the guilty party. The false report which Tyree had made was that two men had robbed him of about a hundred dollars of the hotel's money, when as a matter of fact Tyree had lost the money gambling. The argument is that Tyree's false report to the police, putting on someone else blame for an offense actually committed by him, bears directly upon his credibility in testifying concerning the present affair.

If the question had been presented upon the theory now advanced, it would have been in a different form from that in which it was actually presented. It would have been whether he (Tyree) had in fact once made a false report to the police, putting upon someone else blame for an offense committed by him; the gist of the question would not have been the forfeiture of collateral. If the question had been put to Tyree, in the regular course of cross-examination, in the form now advanced for consideration, the trial court could properly have permitted it. But the situation as it actually occurred was not that way. The question was not proffered at that time, or upon that theory, or in that form, and the trial court did not permit it to be asked. Our problem is whether reversible error was thus committed.

A combination of three considerations controls the answer to the problem. In

2. This was a violation of Sec. 5, Art. XIX, of the Police Regulations for the District of Columbia.

3. 31 Stat. 1357(1901), as amended, D.C. Code § 14–305 (1951).

4. Thomas v. United States, D.C.Cir., 1941, 74 App.D.C. 167, 169, 121 F.2d 905, 907;

Clawans v. District of Columbia, D.C. Cir., 1932, 61 App.D.C. 298, 299, 62 F.2d 383, 384; Crawford v. United States, D.C.Cir., 1930, 59 App.D.C. 356, 41 F. 2d 979.

5. Pullman Co. v. Hall, 4 Cir., 1932, 55 F. 2d 139; 3 Wigmore, Evidence §§ 977–985 (3d ed. 1940).

the first place the question sought to be asked Tyree only remotely approached the merits of the issue on trial. As will have been seen from our recitation hereinabove, Tyree's testimony, while a link in the chain, was not a particularly material one. The case against Kitchen rested upon the facts that he was drinking with Hysan the afternoon before the crime; that they went together to Kitchen's room and drank there; that after the offense Kitchen had Hysan's hat, overcoat and suit in his possession; that Kitchen at once left town; and that he, himself, gave conflicting testimony, flatly contradicting at the second trial testimony he had given at the first one. The few facts to which Tyree testified were not vital, and other witnesses testified to most of them. The most that could have been asked Tyree upon the impeaching inquiry was whether he had made a false report; since it was a public record he probably would have answered in the affirmative, and there the matter would have ended. When this whole record is read it is difficult to see how that answer could have affected the result. It would have been difficult, if not impossible, for the jury to conclude that Tyree testified falsely about the routine matters, also described by others, which he recited. As to Tyree's being a possible suspect, there seems to us to be nothing but speculation to that effect, and many facts appear in the record which contradict the idea.

In the next place the trial court has, and must have, considerable discretion in permitting recross-examination.[6] The court has some discretion in limiting cross-examination, but in this case the judge did not limit the cross-examination. The inquiry continued until defense counsel announced that he had no more questions. A trial court cannot permit recalls of witnesses without a firm limitation and without cogent reasons. If it did, a trial would become a hopeless morass. Recall is often proper, but it ought to be confined to instances where good cause is shown, and the trial court must have wide discretion in respect to the matter.

In the third place the problem was not put to the District Court. If we were of opinion that, had the question been urged upon the theory we are now considering, the court would have been compelled to allow the recall, we might have to reverse. But we are not of that opinion. Even upon the theory under discussion, the remoteness of the question from the merits and the fact that it was a recall would have placed the matter within the sound discretion of the court. We cannot say it erred under such circumstances when its discretion was never invoked.

The case was fairly tried throughout. Kitchen was ably and vigorously defended. We think the trial court acted within its reasonable discretion. Its judgment will therefore be

Affirmed.

BAZELON, Circuit Judge (dissenting).

As the prosecutor stated in summation to the jury, Government witness Tyree was the "only one other person who could have gotten into [appellant's] room" where the fatal injuries were inflicted. Because it was therefore conceivable that he could have committed the crime, the jury was bound to view his testimony with corresponding caution. Hence, information affecting his credibility was of critical importance.

The question which the trial court excluded on Tyree's cross-examination bore directly and heavily on his credibility. The obvious purpose of the question was to elicit information which would show that he had recently made a false report to the police for the purpose of placing the blame on someone else for a crime which he had committed.

---

6. Chevy Chase Dairy v. Mullineaux, D.C. Cir., 1934, 63 App.D.C. 259, 260, 71 F. 2d 982, 983; Perrott v. Leahy, 1939, 302 Mass. 318, 19 N.E.2d 10. And see cases collected at 53 Am.Jur., Trial § 123.

This court concedes the excluded question was proper for that purpose. But because defense counsel rested his argument for admissibility on "showing that a charge had been placed against [Tyree] and that he forfeited [collateral]," this court approves exclusion of the question. I respectfully submit that this distinction is legal hairsplitting which, particularly in a capital case, undercuts our traditional concept of fundamental fairness Accordingly, I would hold the exclusionary ruling erroneous.

Tyree's testimony bore upon at least two important and related issues upon which the evidence was in conflict: (1) the time during which the fatal injuries could have been inflicted, and (2) appellant's whereabouts during such time. Testimony supporting the view that the fatal injuries were inflicted between 1:00 a. m. and 3:00 a. m. on January 8 was given by Government witness Zandjabil, who occupied the hotel room next to appellant's. Zandjabil stated that during those hours he heard someone leave appellant's room as if to go to the men's room and then return; shortly thereafter he heard voices shouting, "Stop it! Stop it!" and "Shut up! Shut up!"; he believed there were more than two voices, and the voices continued for about ten minutes.

Tyree's testimony, on the other hand, may be read as indicating that the fatal injuries were not inflicted during those very early morning hours. He stated that, although he went to the vicinity of appellant's room at about 2:30 a. m., as a result of a complaint from one of the tenants (who did not testify), he did not enter because he heard only snoring from appellant's room; at about 7:00 a. m., a total stranger (who was never otherwise identified) left appellant's room key with Tyree's wife; at about 1:00 p. m., on the same day, Tyree was summoned to appellant's room by a maid and upon entering found a man lying face down on the floor in his underclothes; he thought the man was drunk; and he did not notify the police until about 3:30 p. m.

The only testimony concerning appellant's whereabouts at or near those very early morning hours came from Government witness Berry, who testified that he met appellant near a bus depot at 12:40 a. m. on January 8 and that they went together in search of liquor until about 1:30 a. m. when appellant left him near the bus depot, saying that he was catching a bus for Scranton at 1:30 a. m. Appellant testified that he did catch the bus at that time, although he testified at a former trial that he caught the bus at 4:30 a. m.

I am unable to agree with this court that Tyree's strange testimony related merely "to routine matters." His testimony bore heavily on the crucial question of when the fatal injuries were inflicted. And if the jury had known of Tyree's previous false report to the police, it might very well have rejected his testimony supporting the view that the fatal injuries were not inflicted during the very early morning hours. In that event, the jury might have adopted the testimony of witness Zandjabil and concluded that the fatal injuries were inflicted during those hours when he heard the shouts from appellant's room. And considering the conflict in the evidence concerning appellant's whereabouts during those hours, the jury might reasonably have been in sufficient doubt to acquit.[1] Settled principles applicable in such circumstances require reversal for a new trial.[2]

1. The evidence in this case was, as the trial court told the jury, "entirely circumstantial." That this evidence left lingering doubts of guilt is apparent from the prosecutor's candor to the jury after all the evidence had been concluded. He said: "This isn't the type of case in which you should find a first degree [murder]."

2. "* * * where error occurs which, within the range of a reasonable possibility, may have affected the verdict of a jury, appellant is not required to explore the minds of the jurors in an effort to prove that it did in fact influence their verdict." Little v. United States, 10 Cir., 1934, 73 F.2d 861, 866–867, 96 A. L.R. 889. See Kotteakos v. United

States, 1946, 328 U.S. 750, 763–765, 66 S. Ct. 1239, 90 L.Ed. 1557; Braswell v. United States, 5 Cir., 1952, 200 F.2d 597, 602.

Unfortunately a new trial here would be appellant's third since the first trial was set aside for erroneous instruction. Kitchen v. United States, 1953, 92 U.S. App.D.C. 382, 205 F.2d 720. "But the

standards of justice cannot be relaxed in such a situation: the fact that an accused has undergone more than one trial does not dilute his right to just and lawful treatment. See Leyra v. Denno, 1954, 347 U.S. 556, 74 S.Ct. 716, [98 L.Ed. 948]." Caldwell v. United States, — U.S.App.D.C. —, 218 F.2d 370 (dissenting opinion).