**WOODWARD & LOTHROP,**
et al., Appellants,

v.

**Carnell HILLARY, Appellee.**

**Carnell HILLARY, Appellant,**

v.

**WOODWARD & LOTHROP,**
et al., Appellees.

Nos. 89–994, 89–1082.

District of Columbia Court of Appeals.

Argued April 16, 1990.
Decided Sept. 26, 1991.

Thomas B. Morrison, Rockville, Md., for appellants/cross-appellees.

Metcalfe C. King, Washington, D.C., for appellee/cross-appellant.

Before ROGERS, Chief Judge, FARRELL, Associate Judge, and REILLY, Senior Judge.

FARRELL, Associate Judge:

Woodward & Lothrop, which operates a downtown department store (among others), and Dwayne Wigfall and Earl Sellers, two security guards employed by the store, appeal from a jury verdict in favor of Carnell Hillary on Hillary's tort claims for false arrest, false imprisonment, assault and battery, and conversion, and his claim under 42 U.S.C. § 1983 (1989) for violation of his civil rights. Contesting the judgment on the constitutional tort claim, appellants assert that the trial judge erred in concluding as a matter of law that Wigfall and Sellers, who were special police officers commissioned under D.C.Code § 4–114 (1988),[1] acted under color of state law in subduing, arresting and detaining Hillary when he entered the store after closing time in May of 1986. Appellants also contend that the judge erred in allowing the jury to enter a separate finding as to damages on the § 1983 claim, arguing that the components of damages recoverable under the common law tort claims are identical to those comprising § 1983 damages, and thus Hillary received an excessive award for his compensable injuries. Appellants further assert that the judge erred in allowing Dwayne Wigfall to testify that Woodward

& Lothrop had terminated his employment for misappropriation of funds. Finally, both sides challenge aspects of the trial judge's award of attorney's fees to Hillary under 42 U.S.C. § 1988.

For the reasons discussed below, we find no error in the judgment on the jury verdict, and affirm it. We must, however, vacate the award of attorney's fees and remand for a statement of findings and conclusions sufficient to permit meaningful review of that award.

## I. *Facts and Proceedings Below*

On the evening of May 9, 1986, Hillary entered the Woodward & Lothrop store at 11th and F Streets, N.W., to buy clothing. A cashier told him the store was closing. According to Hillary, as he turned to leave, Sellers, a security guard employed by the store, grabbed him, turned him around, and told him to accompany him. As they were walking, Sellers struck him in the right eye without provocation. In the ensuing scuffle Sellers called out for assistance and was joined in the attempt to subdue Hillary by his supervisor, Wigfall. They wrestled Hillary to the floor employing a headlock and landing several punches in the process, and handcuffed him. At some point Hillary was searched and, he asserted, two hundred dollars was taken from his pocket. He was taken in handcuffs across the street to the Woodward & Lothrop security office located in a separate building, where he was detained. Metropolitan Police Department Officers were called to transport him, but after two unidentified officers arrived he was released, and no criminal charges were brought against him. Hillary testified that the two hundred dollars taken from him during the search was never returned. According to medical experts who testified at trial, he suffered a fracture of the zygoma (the cheek bone), permanent drooping of his right eyelid, and permanent restriction in his field of vision as a result of the injuries.

On February 6, 1987, Hillary filed suit against Woodward & Lothrop in Superior Court alleging false arrest, false imprison-

---

1. See note 4, *infra*.

ment, assault and battery, invasion of privacy, intentional infliction of emotional distress and conversion. On December 11, 1987, he filed an amended complaint joining Sellers and Wigfall as defendants and adding a count under 42 U.S.C. § 1983 for violation of his constitutional rights to bodily integrity and against unlawful search and seizure. The case proceeded to trial before Judge Graae and a jury, and at the close of the evidence the judge directed a verdict against Hillary on the invasion of privacy and intentional infliction of emotional distress counts. The judge also ruled as a matter of law that Sellers' and Wigfall's actions were taken under color of state law, and instructed the jury accordingly as part of the charge on the § 1983 claim.[2]

The judge prepared and submitted to the jury a verdict form containing places for the jury to indicate whether it found for or against the plaintiff on each of the remaining counts. For the common law torts, the form included a space for an award of compensatory damages against all defendants jointly and severally, and a space for punitive damages against the individual defendants only. It also contained a space for a separate award of damages on the constitutional tort claim. The jury returned a verdict in favor of Hillary on all counts, awarding him $845 in compensatory damages against all defendants, $10,000 in punitive damages against Sellers and Wigfall on the common law tort claims,[3] and $40,000 against all defendants on the constitutional tort claim. The judge denied the defendants' motion for a new trial or for a remittitur, and an appeal was noted.

On May 16, 1989, Hillary applied for attorney's fees under 42 U.S.C. § 1988, requesting an award based on hours expended on the case and an upward adjustment owing to the uncertain prospect of success and delay in receipt of payment of fees. The judge entered an order granting the application in part by awarding the base amount, but denying the requested multipliers. The defendants noted a second appeal from the order awarding attorney's fees, and Hillary noted a cross-appeal from the judge's denial of his request for upward adjustment of the base amount.

## II. Section 1983 Issues

### A. Color of State Law

■ Appellants contend that the trial judge erred in concluding, as a matter of law, that Sellers and Wigfall acted under color of state law in subduing, arresting and detaining Hillary. We find no error in the judge's resolution of this issue, as Sellers and Wigfall were exercising authority conferred on them by their commission as special police officers.[4]

---

2. The parties stipulated, and the judge instructed the jury, that if the jury found Sellers and Wigfall liable for violating Hillary's constitutional rights, Woodward & Lothrop would also be liable on the § 1983 claim. Because Woodward & Lothrop expressly conceded liability on that condition, we have no occasion to decide whether a private employer can ever be held vicariously liable for the constitutional torts of an employee on a *respondeat superior* theory. *But see Temple v. Albert*, 719 F.Supp. 265, 268 (S.D.N.Y.1989) (citing *Iskander v. Village of Forest Park*, 690 F.2d 126, 128–29 (7th Cir.1982)) (private corporate employer not vicariously liable under § 1983); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir.1982); *Draeger v. Grand Central, Inc.*, 504 F.2d 142, 145–46 (10th Cir.1974); *Estate of Iodice v. Gimbels, Inc.*, 416 F.Supp. 1054, 1055 (E.D.N.Y.1976). *See also* Annotation, *Vicarious Liability of Superior Under 42 USCS § 1983 for Subordinate's Acts in Deprivation of Civil Rights*, 51 A.L.R.Fed. 285, 290 n. 12 (1981).

3. Appellants make no separate challenge to the award of punitive damages on this appeal.

4. Pursuant to D.C.Code § 4–114, the Mayor may appoint a special police officer for duty in connection with private property, upon application of the owner of such property. As we have previously observed, *Alston v. United States*, 518 A.2d 439, 440 n. 3 (D.C.1986), a special police officer's commission authorizes him or her to exercise arrest powers significantly broader than those of ordinary citizens or licensed security guards. The relevant statute provides that the officer "shall have the same powers as a law enforcement officer to arrest without warrant for offenses committed within premises to which his jurisdiction extends, and may arrest outside the premises on fresh pursuit for offenses committed on the premises." D.C.Code § 23–582(a) (1989). This authority, though, is limited to the specific place or property the officer has been commissioned to protect. 6A DCMR § 1100.2 (1984).

The trial judge relied on decisions of this court holding that special police officers act as agents or instrumentalities of the state in conducting searches and seizures incident to their power to arrest, and thus are subject to the restrictions of the Fourth Amendment. *See, e.g., United States v. Lima,* 424 A.2d 113, 119–20 (D.C.1980) (en banc); *Alston v. United States, supra* note 4, 518 A.2d at 441–43; *Lucas v. United States,* 411 A.2d 360, 362 (D.C.1980). We agree that this principle controls the question presented here.

To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution or the laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988). A person acts "under color of state law" when he exercises a "power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 49, 108 S.Ct. at 2255 (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)).[5] In *Lima, supra,* we acknowledged that involvement by the state is necessary to trigger the protections of the Fourth Amendment: "a private individual [commits] no constitutional violation ... absent governmental involvement in the intrusion." 424 A.2d at 117. The "state action" we deemed necessary to invoke the Fourth Amendment in *Lima, Alston,* and *Lucas,* and action "under color of state law" for § 1983 purposes, are "obvi-

ously related" if not coextensive concepts. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 928, 102 S.Ct. 2744, 2749, 73 L.Ed.2d 482 (1982). The Supreme Court recently iterated that if the defendant's conduct satisfies the "state action" requirement for purposes of the Fourteenth Amendment, "that conduct is also action under color of state law and will support a suit under § 1983." *West v. Atkins,* 487 U.S. at 49, 108 S.Ct. at 2255 (quoting *Lugar v. Edmondson Oil,* 457 U.S. at 935, 102 S.Ct. at 2753). Thus, we have little difficulty concluding that action by a special police officer fairly attributable to the state for purposes of the Fourth Amendment under *Lima, Alston* and *Lucas* also satisfies the "color of law" prerequisite for a § 1983 suit.

*United States v. McDougald,* 350 A.2d 375 (D.C.1976), on which appellants rely, is not to the contrary. There we held that the mere fact a commissioned special police officer does the allegedly unconstitutional act does not itself denote official action. *Id.* at 378. In particular, we refused to attribute to the state an alleged due process violation—*viz.,* a special police officer's instruction to a witness not to discuss a criminal case with defense counsel outside the presence of the prosecutor—because the officer, in conveying the policy to the witness, "was not performing a public function authorized by his commission as a special policeman." *Id.* In the present case, the required nexus with the state is furnished not by the fact of the commission alone—as in *McDougald*—but by the convergence of the authority bestowed by the

Appellants argue that the *jury* should have been allowed to determine whether Sellers and Wigfall acted under color of state law. It is true that this inquiry is fact-specific to the extent that "[o]nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). But determining the "true significance" of state involvement in private conduct involves analysis of the circumstances of the case in light of principles of constitutional law, and we believe the question is one for the trial court. *See Weise v. Syracuse Univ.,* 522 F.2d 397, 408 & nn. 14, 15 (2d Cir.1975); *Braden*

*v. University of Pittsburgh,* 477 F.2d 1, 4–5 (3d Cir.1973) (case remanded for further hearing and development of the record *by the district court* to enable resolution of state action question). This is especially so where, as here, the facts bearing on the issue—*i.e.,* that the security guards were special police officers exercising arrest powers authorized by their commissions—are essentially undisputed.

5. "[M]ost rights secured by the Constitution are protected only against infringement by governments" and not private individuals. *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 156, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978).

commission and the officers' actions.[6] In *Alston*, citing *McDougald*, we recognized that special police officers are not "in *all* their actions" equated with regular police officers, 518 A.2d at 443 (emphasis added), but we held that a special police officer does act as a state agent or instrument when the challenge "involves the arrest of a suspect and actions related thereto—the broad [special police officer] power that distinguishes the [officer] from a private citizen." *Id.*[7]

Appellants may be correct that the immediate impetus for an arrest and accompanying actions by a special police officer is to secure the interests of the private employer. But in exercising authority conferred by the state and not enjoyed by private citizens, the officer exercises a "power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. at 49, 108 S.Ct. at 2255. Sellers and Wigfall acted under color of this authority in forcibly arresting Hillary, searching him incident to the arrest, and seizing the allegedly converted two hundred dollars. In "acting as public officers" they "assume[d] all the powers and liabilities attaching thereto." *NLRB v. Jones & Laughlin Steel Corp.*, 331 U.S. 416, 429, 67 S.Ct. 1274, 1281, 91 L.Ed. 1575 (1947).[8]

## B. *Separate Award of Damages for § 1983 Claim*

■ Appellants further assert that the jury should have been asked to return a single verdict on compensatory damages, and that the court erred in submitting damages on the common law torts and the § 1983 claim to the jury separately. They argue that the elements of compensatory damages recoverable for the torts of false arrest, false imprisonment, assault and battery, and conversion are identical to those recoverable for the violations of constitutional rights that Hillary alleged, and that absent some element of injury not compensated by the common law tort damages, the return of two awards for essentially the same injury constitutes an excessive recovery.

Congress intended the § 1983 cause of action to supplement preexisting state remedies available to redress injuries when the acts causing those injuries also constitute a deprivation of constitutional or federal rights. *Monroe v. Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961), *overruled in part by Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). But while a plaintiff may seek damages for his injuries on a variety of legal theories, "a cardinal principle of law is that ... a plaintiff can recover no more than the loss

---

**6.** Governmental licensing or extensive regulation of private activity alone does not warrant ascribing acts of the regulated entity to the state. *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 177, 92 S.Ct. 1965, 1973, 32 L.Ed.2d 627 (1972).

**7.** As *McDougald* itself pointed out, "the power of arrest ... is the sole factor which distinguishes the holder of a special police commission from a private citizen," suggesting that when a special police officer performs the distinctive function authorized by his commission, he acts as an agent of the state. 350 A.2d at 378.

**8.** Other courts have applied these principles to reach the same conclusion in circumstances similar to those presented here. *See, e.g., Griffin v. Maryland*, 378 U.S. 130, 132–35, 84 S.Ct. 1770, 1771–73, 12 L.Ed.2d 754 (1964) (special policeman deputized under Maryland county ordinance to protect amusement park acted under color of state law in arresting plaintiffs for trespassing); *Williams v. United States*, 341 U.S.

97, 98–100, 71 S.Ct. 576, 577–79, 95 L.Ed. 774 (1951) (private detective who held a special police officer's license issued by the City of Miami acted under color of law in participating in "third degree" of plaintiff); *Temple v. Albert*, *supra* note 2, 719 F.Supp. at 267 (special patrolmen employed by hospital acting pursuant to statutory grant of police power acted under color of state law in assaulting plaintiff incident to an arrest); *Rojas v. Alexander's Dep't Store*, 654 F.Supp. 856, 858 (E.D.N.Y.1986) (special patrolman employed by department store acted under color of state law in arresting and handcuffing plaintiff); *Thompson v. McCoy*, 425 F.Supp. 407, 409 (D.S.C.1976) (security guard employed by store with statutory power identical to sheriff's to arrest for crimes committed on the premises acted under color of state law in arresting and assaulting plaintiff); *DeCarlo v. Joseph Horne & Co.*, 251 F.Supp. 935, 936 (W.D.Pa.1966) (store detective entitled to arrest under Professional Thieves Act acted under color of state law in arresting plaintiff).

actually suffered." *Kassman v. American Univ.*, 178 U.S.App.D.C. 263, 267, 546 F.2d 1029, 1033 (1976) (per curiam); *see Reid v. District of Columbia*, 391 A.2d 776, 777 (D.C.1978). The purpose of money damages recoverable for violation of constitutional or federal rights under § 1983, like that of common law tort damages, is to provide compensation for the injury caused by the defendant's breach of duty (or intentional tort). *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 306–07, 106 S.Ct. 2537, 2542–43, 91 L.Ed.2d 249 (1986); *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978) (jury may award nominal damages for deprivation of a constitutional right absent proof of injury, but "substantial damages should be awarded only to compensate actual injury"). In determining the elements of damages recoverable under § 1983, the Supreme Court has instructed courts to look first to common law tort rules of recovery for pecuniary and non-pecuniary loss, specifically whether these provide fair compensation for injuries caused by the particular deprivation of constitutional rights alleged. *Id.* at 257–58, 98 S.Ct. at 1049–50. While application of tort law analogs may not, in all cases, fairly compensate for violation of constitutional rights, *id.* at 258, 98 S.Ct. at 1049, "actual injury" remains the touchstone, and "damages based on the abstract 'value' or 'importance' of constitutional rights are not a permissible element of [§ 1983] damages...." *Stachura*, 477 U.S. at 310, 106 S.Ct. at 2544.

Hillary alleged that he was accosted in the store, illegally arrested, beaten, dragged across a public street in handcuffs, detained and wrongfully deprived of two hundred dollars in an unlawful search and seizure. These acts caused him monetary loss, physical injury, mental anguish, humiliation, and embarrassment. He sought compensation for the injuries by alleging violation of his constitutional rights to be free from unlawful arrest, search and seizure, and physical abuse, and by his common law tort claims for false arrest, false imprisonment, assault and battery and conversion. Thus, as appellants assert, Hillary alleged no injury in his § 1983 claim that could not fully be compensated by recovery on his common law claims. *Stachura*, 477 U.S. at 307, 106 S.Ct. at 2543 (§ 1983 damages can include compensation for monetary loss, personal humiliation, mental anguish and suffering). Because his § 1983 claim essentially was an alternative basis for the same recovery sought by way of the tort claims, submission of two verdict forms on damages created a substantial risk that the jury would allow him to recover twice for a single injury. *See Clappier v. Flynn*, 605 F.2d 519, 528–30 (10th Cir.1979). Separate damage verdicts also could have suggested to the jury that there was a compensable component of a "constitutional" deprivation independent of the injury actually suffered, contrary to *Stachura*.[9]

Accordingly, we must determine whether either of these risks materialized—whether the jury's verdict reflects double recovery or likely was based on any other factor than the actual amount of injury suffered. If so, then it must be set aside.

In overruling the defendants' objection to bifurcation of damages on the ground that the jury might award a double recovery, the trial judge told the parties:

> [The jury] is going to be instructed very clearly on the question of damages that they are only to award damages that they believe will compensate [plaintiff] on what he is fairly entitled to in whatever category that they are asked to do it.

Although the judge then instructed the jury to return separate verdicts on damages, in his charge on the elements of damages he did not distinguish among Hillary's various claims but instead explained—as to all claims—that the jury

---

**9.** The trial judge submitted the damages issue on separate verdict forms in response to Hillary's counsel's concern that, if the defendants prevailed on their appeal of the court's "color of law" ruling, the entire verdict would be set aside because it would be impossible to determine how much of the award the jury attributed to the common law tort claims, making a retrial on damages necessary.

must "determine what amount will fairly and reasonably compensate the Plaintiff for his injuries and damages." They were to consider

> the extent and duration of any bodily injuries sustained; the effect [of] such injuries ... on the overall physical and mental health and well-being of the Plaintiff; any physical pain and mental anguish the Plaintiff has suffered; any disfigurement or deformity and any humiliation or embarrassment associated with it; any inconvenience or discomfort that has been suffered by the Plaintiff ... or [that he] will probably suffer in the future; any medical expenses that the Plaintiff has incurred and finally any damage or loss to the Plaintiff's personal property.

Just before the jury retired, the judge instructed:

> Let me emphasize to you that the two damage considerations that you have to make, if you get to them, they are for the three common law claims together and then as to the Constitutional claim separately. You should in each of these two categories ... award as I have instructed you before, only those damages as to those claims that you feel are appropriate and would reasonably compensate the Plaintiff.

These instructions do not ease entirely our misgivings about the submission of separate verdict forms on damages. In future cases of this kind, the trial judge should make explicit by instructions that the plaintiff may receive only those damages which, in the aggregate, fairly compensate for the injuries actually suffered. Nevertheless, the instructions given did tend to protect against a double recovery. Moreover, and of key significance to our holding, the verdict returned suggests strongly that the jury followed the court's admonition. On the common law claims, the jury awarded Hillary $845, an amount conforming exactly to his claim for pecuniary losses, which included $645 in medical bills and the $200 allegedly taken from him. On the § 1983 claim, considering the testimony which the jury credited in finding the defendants liable, the verdict of $40,000 was not plainly unreasonable as compensation for plaintiff's non-pecuniary losses as specified in the jury instruction quoted above. We hold, therefore, that the two verdicts rendered do not manifest an award of double damages.

### III. *Admissibility of Wigfall's Statement*

■ Appellants contend that the judge committed reversible error in admitting defendant Wigfall's testimony that he had been discharged by Woodward & Lothrop for misappropriation. In fact, however, Wigfall's testimony that he had been fired for that reason occurred as an apparent surprise to everyone, in a manner it is necessary to describe.

At trial Hillary called Wigfall as an adverse witness. During direct examination, Hillary's counsel established that Wigfall had left Woodward & Lothrop's employment in November 1988 and asked why Wigfall had left, but defense counsel objected before the witness could respond. Previously, defendants had moved *in limine* to exclude any reference to the fact that Wigfall was no longer a security guard at Woodward & Lothrop, anticipating an attempt by Hillary to show that Woodward & Lothrop had removed him because he acted wrongly in treating Hillary. Defendants asserted, to the contrary, that Wigfall had been transferred to a different post "as a combination of declining performance and his request to be moved," and that even if he had been replaced as security guard because of the present incident, the transfer was a subsequent remedial measure, proof of which is generally inadmissible.

Apparently the trial judge did not rule on the motion before Wigfall took the stand, and defendants repeated these arguments in objecting to the question by plaintiff's counsel cited above. The following exchange then took place at the bench:

> MR. MORRISON [defendants' counsel]: The fact that he's no longer a security guard is one of the points of our motion in limine; that that is not subject to the precaution taken by Woodward &

Lothrop. That is not admissible to show liability.

MR. KING: [plaintiff's counsel]: I did not know why he was no longer at Woodward & Lothrop. If he would stipulate that Mr. Wigfall was terminated, we would take a stipulation.

MR. MORRISON: But it's not admissible.

THE COURT: What's the basis for it? Why do you need it in, Mr. King?

MR. KING: I'm trying to find out why he no longer works for Woodward & Lothrop.

THE COURT: Yes, why?

MR. KING: I believe Mr. Wigfall was terminated as a result of this incident. I believe he was. Now, that may have been a corrective action by Woodward & Lothrop, but that's not my purpose for raising it. My purpose for raising it is to prove that in fact Carnell Hillary was improperly treated at Woodward & Lothrop that day.

MR. MORRISON: I don't think it's—

THE COURT: I will let you ask him.

Hillary's counsel repeated the question, and asked whether it was true that Wigfall had been terminated for declining performance as defendants had asserted in their motion *in limine.* When Wigfall replied yes, counsel asked the question approved by the trial court—whether Wigfall was terminated as a result of the incident with Hillary—to which Wigfall replied no. Counsel then asked Wigfall to specify the nature of the declining performance that led to his termination, and after another fruitless objection by defense counsel, Wigfall answered, "I misappropriated some funds from Woodies."

■ We need not decide whether the judge ruled correctly in allowing Hillary to pursue questioning about a "subsequent remedial measure," *cf.* C. McCORMICK, McCORMICK ON EVIDENCE § 275 (3d ed.

1984), because Wigfall's answer made clear that his firing had nothing to do with his conduct involving Hillary. Instead we must consider appellant's argument that the effect of the questioning was to allow Wigfall's testimony to be impeached—"in a case where credibility was essential"—by "evidence of a bad act unaccompanied by evidence of a criminal conviction." Appellants argue that D.C. Code § 14–305(b)(1) (1989) limits impeachment by other conduct to acts resulting in conviction.[10] While that is generally true, we have also recognized and applied the principle that "a witness may be cross-examined on a prior bad act that has not resulted in a criminal conviction ... where: (1) the examiner has a factual predicate for such question, and (2) the bad act bears directly upon the veracity of the witness with respect to the issues involved at trial." *Sherer v. United States,* 470 A.2d 732, 738 (D.C.1983) (citations and internal quotation marks omitted) (stating the rule), *cert. denied,* 469 U.S. 931, 105 S.Ct. 325, 83 L.Ed.2d 262 (1984); *Roundtree v. United States,* 581 A.2d 315, 323 (D.C.1990); *see Pullman Co. v. Hall,* 55 F.2d 139, 141 (4th Cir.1932); *Vogel v. Sylvester,* 148 Conn. 666, 671, 174 A.2d 122, 127 (1961); 3A WIGMORE, EVIDENCE § 982 (Chadbourn rev. 1970); C. McCORMICK, *supra,* § 42.

In this case, it is unnatural to inquire whether Hillary had a factual predicate on which to ask whether Wigfall had been fired for misappropriation because that is not the answer Hillary—or apparently anyone else—expected. Nevertheless, Wigfall's own answer established a sufficient basis for the conclusion that he had engaged in misappropriation. Moreover, given the trial judge's express allowance of the questioning, we cannot find bad faith by Hillary's counsel in pursuing a line of inquiry designed (erroneously, as it turned out) to link Wigfall's firing to his actions in regard to Hillary. Thus, the primary issue

---

10. D.C.Code § 14–305(b)(1) provides in part: Except as provided in paragraph (2), for the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a criminal offense shall be admitted if offered, either upon the cross-examination

of the witness or by evidence aliunde, but only if the criminal offense (A) was punishably by death or imprisonment in excess of one year under the law under which he was convicted, or (B) involved dishonesty or false statement (regardless of punishment).

is whether the conduct Wigfall admitted—misappropriation of employer funds—is of a kind that "[bore] directly upon [his] veracity" with respect to the issues at trial, in particular his defense that he had done no more than subdue an unruly and belligerent customer who refused to leave the store. Under the Federal Rules of Evidence, as under the rule of *Sherer*, a witness may be impeached with acts not resulting in conviction if those acts are "clearly probative of truthfulness or untruthfulness." Fed.R.Evid. 608(b) (1989). Federal courts have held that conduct amounting to embezzlement satisfies this condition. *See* J. WEINSTEIN, WEINSTEIN'S EVIDENCE, ¶ 608[05], at 608–46 (1988); *United States v. Schwab*, 886 F.2d 509, 514 (2d Cir.1989), *cert. denied*, 493 U.S. 1080, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990); *United States v. Leake*, 642 F.2d 715, 718 (4th Cir.1981).[11] We conclude that Wigfall's admission to misappropriation was probative of his truthfulness in this case.

■ Appellants' final argument is that the judge failed to balance the probative value of the impeachment against its potential for prejudice. *See Roundtree*, 581 A.2d at 323. The trial judge, however, was as surprised as anyone by Wigfall's answer. In their *in limine* motion appellants never explained to the judge that Wigfall had been fired for misappropriation, referring only to his "declining performance." When the answer came out, they did not move to strike it as overly prejudicial. In these circumstances, the judge cannot be faulted for failing to conduct a balancing he was given no opportunity to perform.[12] Nor are we persuaded by appellants' suggestion that Hillary's counsel exploited the answer so as to invite the jury to draw a forbidden "propensity" inference—that because Wigfall had been discharged for misappropriation, he was likely to have stolen Hillary's money as plaintiff alleged. The

only reference even colorably raising this possibility occurred during closing argument when counsel stated:

> We are talking about credibility. Mr. Wigfall who was hired by Woodward & Lothrop to protect its property from deprivation was fired by Woodward and Lothrop. For what? He said it himself. He took some money from Woodies. But, that's the same man that arrested this man for simply walking in the store. And he was just doing his job.

Any suggestion in these statements that the jury could infer a general propensity for theft from Wigfall's confessed dishonesty is too attenuated to justify setting aside the jury's verdict.

### IV. *Attorney's Fees*

■ Finally, both sides challenge the trial judge's order awarding attorney's fees to Hillary: appellants assert that the judge abused his discretion in failing to discount the fee requested to reflect excessive amounts of time claimed for certain tasks, while Hillary contends that the judge erred in failing to adjust the fee upward to reflect the risk of nonpayment and delay in payment of fees. We do not reach the merits of these issues. Because the judge set out no findings and conclusions, we are unable to determine whether he exercised his discretion in accordance with the legal standards governing fee awards under 42 U.S.C. § 1988. Even in the context of more conventional fee awards, we have pointed to the need for specific findings by the trial court. *Swift v. Swift*, 566 A.2d 1045, 1047–48 & n. 2 (D.C.1989). And, in the context of awards under § 1988, the Supreme Court has stressed that "it remains important ... for the [trial] court to provide a concise but clear explanation of its reasons for the fee award." *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct.

---

11. By citing to Fed.R.Evid. 608(b), we do not mean to suggest identity in all respects between that rule and the rule stated in *Sherer*.

12. Appellants argue that Wigfall's misappropriation had little relevance to the issues at trial because it occurred some two and one-half years after the alleged assault and false arrest.

But since the testimony was relevant only to impeach Wigfall's testimony at trial, the pertinent time-frame is the time between the bad act probative of veracity and the *time of the trial testimony*. Wigfall was discharged in November 1988 and gave his trial testimony in March 1989, only four months later.

1933, 1941, 76 L.Ed.2d 40 (1983); *see also Blum v. Stenson,* 465 U.S. 886, 892, 104 S.Ct. 1541, 1545, 79 L.Ed.2d 891 (1984); *Henderson v. District of Columbia,* 493 A.2d 982, 998–1003 (D.C.1985).

For the foregoing reasons, the judgment on the verdict is affirmed and the order awarding attorney's fees is vacated and the case remanded for the entry of findings in accordance with the standards governing § 1988 fee awards.

*So ordered.*

REILLY, Senior Judge, dissenting:

In my opinion, two rulings of the trial court were not only erroneous, but so prejudicial to the defense, that I would set aside the verdicts for damages and order a new trial.

I.

The most serious error was the refusal of the court to overrule an objection to a question by plaintiff's counsel designed to draw the jury's attention to some misconduct by defendant Wigfall. This elicited the admission that he had been discharged by Woodward & Lothrop from his job as security officer for "misappropriation of funds." This testimony—clearly inadmissible as evidence of an unrelated crime for which the witness had never been convicted—was allowed to remain in the record and was utilized repeatedly by plaintiff throughout the rest of the trial to smear the entire case put on by the defense. As plaintiff's own claim rested on testimony, not only uncorroborated but incredible on its face, it is difficult to believe that a jury would have returned a verdict in his favor had not this prejudicial evidence been admitted. In reaching a contrary conclusion, my colleagues have apparently overlooked this aspect of this case.

Just before Wigfall was called to the stand, plaintiff Hillary, as the first witness in the trial, had given the jury his account of what had happened to him when he entered the store one June evening at closing time. Describing himself as a regular customer at this downtown retail establishment, who had purchased some items of clothing there that very morning, plaintiff testified that in revisiting the store that evening, he had passed the doors and stepped only ten feet inside when he was told by a cashier that the store was closing.

According to his testimony, he "immediately started to turn around and go back out," but was grabbed by Sellers, another security officer, who turned him around, refused his request to let him go out the door, and insisted that he come with him. Plaintiff stated he immediately complied, but as they were walking together to the security office, Sellers punched him in the eye, called for assistance to arrest plaintiff, who was then "assaulted and battered further and ... immediately wrestled to the floor." Identifying Wigfall as one of the men responding to Sellers' call for help, plaintiff then recalled that when they could not contain him, they attempted to knock him unconscious by punching him and finally wrestled him to the floor, where they handcuffed him and removed two hundred dollars from his pockets.

In short, plaintiff portrayed himself as the victim of a totally unprovoked assault by an agent of a department store—conspicuous for its efforts to retain the good will of customers who still do their shopping in the fading downtown retail area. To avoid undue offense to late arriving customers (as well perhaps as to forestall potential shoplifters), it was the practice at Woodward & Lothrop's to assign a security officer after the closing bell is sounded to stand near the unlocked doors to warn tardy entrants that the store had closed and to see to it that they complied with requests to leave. It is scarcely conceivable that a customer immediately responding to such a request would be detained or physically attacked by any security officer in the absence of some personal animosity between them. There is not the slightest suggestion in this case that Sellers, the asserted assailant here, had ever seen plaintiff before. Hence, it is most unlikely that any reasonable jury would have believed Hillary's version of what had happened unless his testimony were allowed to stand uncontradicted.

Before trial began, however, plaintiff's counsel was aware that his client's testimony would be contradicted. He had already taken the depositions of two key defense witnesses, Sellers and Arlene Marshal (a sales clerk-cashier), and learned that they would testify that Sellers was standing inside the doors after the closing bell had rung, with one side of the doors remaining unlocked in order to provide an exit for departing customers and shop personnel. As Sellers was chatting with Miss Marshal, plaintiff entered the store apparently dazed and mumbling to himself. Sellers informed him that the store had closed, but the stranger proceeded past the pair into the interior of the store. The security officer then called after him, repeating his announcement and requesting that he leave. When plaintiff ignored these requests, Sellers followed him and touched his arm in an attempt to gain his attention. Plaintiff swung at him and a fight broke out. Miss Marshal, seeing the scuffle, went back to the door and summoned Wigfall, who was on duty at the main store across the street, to come to the rescue. By the time Wigfall arrived, Sellers and plaintiff were on the floor wrestling. The two guards eventually were able to subdue plaintiff, handcuff him, and carry him to the security office.

Confronted with the prospect of this testimony, plaintiff's counsel adopted the strategy of discrediting the character of the defendants in the eyes of the jury, even before any testimony concerning the Hillary incident was presented by the defense. As part of this strategy, he called to the stand Wigfall, who was not a witness to the crucial events of the case—the issue of whether Hillary's arrest was triggered by his own misconduct in refusing to leave and assaulting the guard who insisted on his departure—and proceeded to interrogate him as to why he had been discharged from his employment. As Wigfall was Sellers' superior officer, he obviously hoped by painting Wigfall as a villain and Sellers as an accomplice, to persuade the jury that plaintiff was an innocent victim of a larcenous plot.

1. Super.Ct.Civ.R. 43(b).

Since Wigfall was an adverse party, plaintiff, under the applicable rule of the Superior Court,[1] was indeed vested with considerable latitude in his examination of this witness, including the right to put leading and even hostile questions to him. But counsel's election to call Wigfall as his own witness, gave him no greater rights than he would have enjoyed on cross-examination had he waited for the defense to call him, for even a cross-examiner is precluded from questioning a witness on irrelevant issues or on matters beyond the scope of his direct testimony, to say nothing of interrogation on such subjects as the commission of other crimes or even misconduct unrelated to the evidence in the particular case.

Bearing in mind these limitations, it seems to me that there were several things wrong with the procedure adopted by the trial court after Wigfall had been sworn and had stated that he was no longer a Woodward & Lothrop employee:

(1) As a motion for an *ad limine* ruling was pending, the court, once reminded by counsel of this posture of the motion and engaging in a short bench colloquy, should have heard *in camera* all testimony concerning the termination of defendant Wigfall's employment as a guard before ruling on its admissibility. By permitting the jury to listen to the inquiry on an issue reserved solely for judicial determination, the court, even if it had ultimately ruled certain questions improper, allowed plaintiff's counsel to implant in the minds of the jurors the impression that either the corporate defendant or the individual defendants were trying to hide something.

(2) The court committed error by tacitly agreeing that plaintiff was entitled to ascertain whether Woodward & Lothrop had removed Wigfall from its guard force because it had concluded from its own investigation that his treatment of Hillary was improper. If that were indeed the purpose of the question, all that it would have proved was that the employer had taken corrective action as a precaution

against the future occurrence of such incidents. Under the common law of this jurisdiction, as well as the federal rules, *see* FED.R.EVID. 407, evidence of such remedial measures to prove fault is not admissible. *Avery v. S. Kann Sons, Co.,* 67 App.D.C. 217, 218–19, 91 F.2d 248, 249–50 (1937); *Altemus v. Talmage,* 61 App.D.C. 148, 152, 58 F.2d 874, 878, *cert. denied,* 287 U.S. 614, 53 S.Ct. 16, 77 L.Ed. 533 (1932). *See also Columbia & Puget Sound R.R. Co. v. Hawthorne,* 144 U.S. 202, 207, 12 S.Ct. 591, 593, 36 L.Ed. 405 (1892) (Supreme Court explained that this kind of evidence should not be admitted for "it is calculated to distract the minds of the jury from the real issue, and to create a prejudice against the defendant").

(3) But even assuming, *arguendo,* the asserted ground for this line of questioning was to bring out relevant evidence, it soon became plain that there was no evidence that Wigfall's removal from his job had anything to do with the Hillary arrest. Wigfall testified that he was terminated on November 15, 1988, and when asked if such termination was the result of the Hillary incident, he answered "no." Both court and counsel must have known that this answer was truthful. If Wigfall was still on the payroll for more than two years after the Hillary incident—and almost two years after the law suit commenced—his discharge could scarcely have been due to employer dissatisfaction with his conduct in a matter so remote in time.

Yet counsel persisted in asking the precise reason for the discharge of the witness. In my view, the court should have sustained the objection to this question, for it was obvious that counsel ahd no reason for propounding it except in the hope of bringing to the jury's attention some conduct discreditable to Wigfall. I respectfully disagree with the majority opinion's comment that Hillary's counsel was acting in good faith in "pursuing a line of inquiry to link Wigfall's firing to his actions in regard to Hillary." At this point in the trial, any notion of such linkage had already been dispelled.

It may be true that despite his extensive pretrial investigation, counsel did not expect the exact answer Wigfall gave to his question. An employer may have all sorts of reasons for firing a long term employee. Some of them, like chronic absenteeism, rudeness to customers or fellow employees, or failure to follow instructions, do not reflect adversely on a person's reputation or character, and if Wigfall had answered that some relatively innocuous conduct of the sort had cost him his job, counsel would have drawn a blank. But if he could have shown the jury that in Wigfall's case, the reason for this discharge was falsifying records, drunkenness on duty, physical harassment of others, dishonesty, or some other kind of flagrant misbehavior, he would have struck pay dirt. And this is precisely what counsel accomplished by asking his question and what the trial court could have prevented had it confined counsel to *voir dire* examination of Wigfall outside the presence of the jury. Consequently, I do not share my colleagues' view that Wigfall's answer "occurred as an apparent surprise to everyone," or that appellants might have cured its potential for prejudice by moving to strike. As the court had just overruled his objection to the question, counsel might well have concluded that at this point in the trial, the court was unlikely to repent its ruling.

In rejecting appellant's argument that Wigfall's damaging answer—an admission of the crime of embezzlement—was inadmissible under D.C.Code § 14–305(b)(1) (1989), the majority opinion is inconsistent with controlling precedent. This subsection of the code requires trial courts, for the purpose of attacking the credibility of a witness, to admit evidence of convictions for felonies or offenses involving "dishonesty or false statement." No one would argue that a conviction for misappropriation of employer funds does not fall into this second category, had Wigfall been convicted of this offense, which, of course, he never was. The majority opinion seems to hold that the absence of any conviction is immaterial because, *inter alia,* under the Federal Rules of Evidence, a witness may be impeached with acts not resulting in

conviction if such acts are "clearly probative of truthfulness or untruthfulness," FED.R.EVID. 608(b), and that federal courts have held that conduct amounting to embezzlement satisfies the condition.

It has indeed been argued in the past that by mandating the admission of convictions for certain kinds of crimes, § 14–305(b)(1), *supra,* does not deprive Superior Court judges from exercising discretion, as federal judges do, to admit evidence of other crimes which bear on veracity even though there has been no conviction. In a leading case, however, which I had always supposed was binding upon us, our court rejected this argument, holding that crimes for which no sentence had as yet been imposed could not be offered in evidence as convictions, even if a jury had returned a guilty verdict. *Langley v. United States,* 515 A.2d 729 (D.C.1986). In that opinion, our court deemed irrelevant federal holdings to the contrary, pointing out that the difference in wording between FED.R.EVID. 609, which governs federal court administration and § 14–305, applying to the Superior Court. Accordingly, the majority opinion's reliance upon another federal rule, FED.R.EVID. 608(b), for holding that the trial court may admit evidence of even an uncharged offense, cannot be reconciled with the *Langley* decision.

Equally at odds with *Langley* is the majority's assumption that *Sherer v. United States,* 470 A.2d 732, 738 (D.C.1983) supports the proposition that there is a well recognized exception to the rule that a witness may not be cross-examined on a prior bad act not resulting in a criminal conviction "where: (1) the examiner has a factual predicate for such question, and (2) the bad act 'bears directly upon the veracity of the witness with respect to the issues involved at trial.'" (Citations omitted.) In *Sherer,* the quoted rule was merely dictum, for its final holding was that it was not error for

the trial judge to exclude evidence that the government's key witness had perjured himself in previous cases when he had also testified against an accomplice who was being prosecuted. A similar attempt to explore a complaining witness' history of lodging false accusations of sexual assault was also ruled out of order in *Roundtree v. United States,* 581 A.2d 315 (D.C.1990), a case also cited in the majority opinion.

It appears from the text of the *Sherer* opinion, that the author merely adverted to a rule quoted, but also not applied, in *United States v. Akers,* 374 A.2d 874, 878 (D.C.1977), which actually had its origin in a decision of the United States Court of Appeals for this circuit, *Kitchen v. United States,* 95 U.S.App.D.C. 277, 221 F.2d 832 (1955). As that opinion was handed down some fifteen years before Congress enacted § 14–305, it throws no light upon how that statute should be construed—the principal evidentiary issue in this case.[2]

In sustaining objections to proffered evidence of perjury in similar criminal prosecutions, the authors of the *Sherer* and *Roundtree* opinions, *supra,* pointed out the potential for prejudice if such evidence was introduced in the jury's presence. Yet, impeachment on the ground of previous perjury would certainly be much more "probative of truthfulness as untruthfulness" than an act of embezzlement. We are told nevertheless that Wigfall's admission bore directly upon his veracity with respect to the issues at trial, in particular, his defense that he had done no more than subdue an unruly customer who refused to leave the store. This observation ignores the fact that at the time this damaging answer was elicited, the witness had advanced no defense whatsoever concerning his own conduct in the Hillary encounter, as the only questions put to him were directed at subsequent actions by his employer.[3] Thus, he

2. Even if some lingering deference should be accorded the *Kitchen–Sherer* formulation of the conditions under which evidence of prior bad acts may be admitted, such rule plainly did not justify the disputed ruling here. The majority opinion concedes that plaintiff's counsel had no factual predicate for his question. In other words, the first condition laid down by *Kitchen* did not exist in the case before us.

3. It should also be noted that the description of Wigfall's ultimate or anticipated defense is not altogether accurate. Wigfall, not being in the building when the plaintiff entered and was told the store had closed, was in no position to

had testified to nothing at that point which would justify impeaching his credibility. Accordingly, to hold that the credibility of an adverse party may be impeached because of anticipated testimony would seem to enlarge the right of impeachment to unprecedented lengths. If such tactics were proper, it would mean that in every law suit where the result could turn on the resolution of conflicting testimony, *e.g.*, an action to recover damages in an automobile case, the plaintiff could begin the trial by calling the defendant to the stand and asking him whether he had ever issued a check against an overdrawn account or had ever bought cocaine.[4]

Wholly aside from any possible relevance of Wigfall's answer to the veracity of his testimony, however, plaintiff's counsel was not content to treat his answer as something impairing his credibility, but continually reminded the jury that Wigfall was guilty of thievery. On the very next day, (the trial lasted only three days) when Sellers testified that the tape of a camera in the security office would have exposed any failure on the part of security personnel to have returned Hillary's money to him, counsel sarcastically asked whether the person responsible for reviewing the tapes "was the same guy who turned in Mr. Wigfall?" A few minutes later when Wigfall was on the stand and counsel was about to cross-examine him on the money plaintiff asserted had not been returned to him, he prefaced his interrogation by "Now Woodward & Lothrop fired you did it not?"

Although an objection to this question was sustained, its obvious purpose was to suggest to the jury that if Wigfall had misappropriated funds from his employer at some later time, he probably diverted to himself on this occasion most of the money found in plaintiff's pockets.

Finally, counsel drove home his point that Wigfall was such an evil character that his client's account of an unprovoked detention and a brutal beating was indeed credible by arguing to the jury, after a disparaging and misleading description of Sellers' testimony:

> Mr. Wigfall was his supervisor. We are talking about credibility. Mr. Wigfall who was hired by Woodward & Lothrop to protect its property from deprivation was fired from Woodward & Lothrop. For what? He said it himself. He took some money from Woodies. *But that's the same man that arrested this man for simply walking into the store.* And he was just doing his job.

(Emphasis added.)

Not only was this argument a prejudicial misuse of the Wigfall admission, but a blatant distortion of even his own client's account of the incident. According to Hillary, he had already been arrested by Sellers, although he was turning to leave the store, and did not resist arrest until Sellers suddenly punched him. Thus, the allegation that Wigfall was the man who arrested Hillary "for simply walking into the store" was a deliberate attempt to mislead the jury.[5]

---

testify on the issue of whether or not Hillary refused to leave. Even Hillary conceded that Wigfall was not at the scene when Sellers arrested him.

**4.** Until now this court has never countenanced such questioning. *See, e.g., Ford v. United States,* 549 A.2d 1124, 1125–26 (D.C.1988); *Meaders v. United States,* 519 A.2d 1248, 1253–54 (D.C.1986); *Lee v. United States,* 454 A.2d 770, 775 (D.C.1982), *cert. denied McIlwain v. United States,* 464 U.S. 972, 104 S.Ct. 409, 78 L.Ed.2d 349 (1984); *McBride v. United States,* 441 A.2d 644, 650–52 (D.C.1982); *Rogers v. United States,* 419 A.2d 977, 981 (D.C.1980).

**5.** This was not the only time in his summation that counsel was guilty of distorting even the testimony he had offered. Responding to clos-

ing argument by the defense, he told the jury it was

> kind of scary because it could happen to anybody. You could take off your jacket and put on *some torn jeans* and walk into Woodward & Lothrop and it could happen to you.... Why should this ever happen in the District of Columbia? That a young black guy *with torn clothes* goes into Woodward & Lothrop and gets beat up. Why does that happen? That's the case.

Thus, counsel was trying to get the jury to believe that the prime cause for the assault was that the victim was singled out by guard personnel because his tattered clothing indicated he was a disreputable person who had entered the store for no good reason. But counsel had already foreclosed plaintiff from advancing any

It is not the function of an appellate court to set aside a jury verdict merely because the weight of the evidence points to another result, but where evidence was erroneously admitted, unless the reviewing court can say with some assurance that the verdict was not substantially swayed by error, such error cannot be deemed harmless. *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946). In view of the inherent weakness of plaintiff's case, I do not see how we can hold that the judgment challenged here was not "substantially swayed by error." [6]

It is also my opinion that if this had been a criminal case, we would have deemed the tactics of plaintiff's counsel as amounting to prosecutorial misconduct, serious enough to require setting aside a guilty verdict. *Lewis v. United States,* 541 A.2d 145 (D.C.1988); *Jones v. United States,* 512 A.2d 253, 258 (D.C.1986).

Granted that this was a civil action rather than a criminal prosecution, I see no reason for not applying these standards in a case where the defendants were accused of intentional criminal behavior—assault, battery, and larceny—warranting the imposition of punitive damages. We were recently reminded by the Supreme Court that tactics of a plaintiff's trial lawyer, which in the context of a criminal proceeding would have been prosecutorial misconduct, could be grounds for reversing a judgment for damages. *Edmundson v. Leesville Concrete Co.,* — U.S. ——, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991).

## II.

As the majority opinion concedes, Hillary alleged no injury in his claim under 42 U.S.C. § 1983 that could not fully be compensated by recovery on his common law tort claims, it would seem to follow that the trial court erred in submitting two verdict forms, but failing to instruct the jury that if it awarded compensatory damages on the first form, it should deny compensatory damages for the alleged violation of constitutional rights. In this context, there is a real possibility that the jury's determination that plaintiff was entitled to $845 for his tort claims, and $40,000 under § 1983 conferred on plaintiff either a double recovery or the very type of award held improper by the Supreme Court in *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1977), and in *Memphis Community School District v. Stachura,* 477 U.S. 299, 310, 106 S.Ct. 2537, 2544, 91 L.Ed.2d 249 (1986), which overturned a verdict for "damages based on the abstract 'value' or 'importance' of constitutional rights."

It is fundamental law that there can be only one recovery for a single injury. Therefore, a plaintiff cannot split his cause of action by seeking compensation for the same injury on two different legal grounds.

I cannot assume that simply because the jury granted a sum equivalent to Hillary's medical expenses and money loss on the common law tort claim, that the award under § 1983 was not composed of imper-

---

such theory by testimony he had himself brought out. During his direct examination of Hillary, he had exhibited two items of torn clothing to his client, whereupon that witness identified them as a shirt and pants ripped and torn by the guards in their effort to subdue him. The witness said nothing to indicate that his attire was not in good order before the scuffle occurred.

6. The concluding paragraph of *Langley v. United States, supra,* 515 A.2d at 735, should have considerable bearing on our disposition of the instant case.

> Impeachment with prior convictions can be devastating to the party who calls the witness, to a point that some defendants, like appellant, may elect not to testify because of the anticipated impact of such impeachment on the jury. Such "other crimes" evidence inevitably implies legally irrelevant criminal propensity, whatever limiting instruction the court gives to confine the jury's consideration to impeachment. Accordingly, because the legislature has not granted the trial court flexibility to regulate this form of impeachment, we do not believe this court should be influenced by cases under federal Rule 609 to modify the traditional understanding of what a "conviction" for impeachment purposes means in this jurisdiction, absent a showing (and there is none) that a verdict is tantamount to a judgment and sentence.

*Id.* (footnote omitted).

missible components. Unlike the majority, my misgivings over the decision to submit separate verdict forms on damages are not allayed by the result, where in the absence of guiding instructions, the jury arrived at a verdict which causes us to speculate on exactly what factors of compensation the seemingly exorbitant sum of $40,000 represented. On this issue alone a remand for a new trial is in order. *See Stachura, supra,* 477 U.S. at 312, 106 S.Ct. at 2546, citing *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 256 n. 12, 101 S.Ct. 2748, 2754 n. 12, 69 L.Ed.2d 616 (1981).